# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | CRIMINAL NO. 03-146-01 (TFH) |
| | : | |
| DWIGHT WARE WATSON, | : | |
| | : | |
| Defendant. | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

### Introduction

For almost two days in March 2003, the defendant, Dwight Watson, held half of the National Mall and a portion of this metropolitan area hostage by threatening to detonate a potentially large quantity of explosives and commit an immense act of terror. As was widely reported – and as the government's evidence established – Watson's actions significantly disrupted the lives and livelihoods of many in this community.

On September 26, 2003, after only forty-five minutes of deliberations, a jury convicted Watson of both counts in the indictment – threatening and conveying false information concerning the use of an explosive in violation of 18 U.S.C. § 844(e) and destruction of government property in violation of 18 U.S.C. § 1361. On June 23, 2004, Judge Jackson sentenced Watson to 72 months of incarceration, commenting:

> You may not have actually committed a terrorist act, and you may never have intended to do so. Nevertheless, you did terrify the people of this city, and you commanded the attention of [a] major part of its law enforcement resources for two days a year ago last March. Whatever your intentions may have been, this city regarded you as a one-man

weapon of mass destruction, and they treated you accordingly.[1]

Judge Jackson's sentence was at the high end of the then-mandatory guideline range.

On June 30, 2004, in the wake of <u>Blakely v. Washington</u>, 542 U.S. 296 (2004), Judge Jackson vacated Watson's sentence and, believing that he could not apply any enhancements to the base offense level for Watson's crimes, sentenced the defendant to 16 months of incarceration, which was the sentence at the top of the range for a level 12 offense. After computing his good time credits, the Bureau of Prisons released Watson from jail a day or so later.

On appeal, the D.C. Circuit remanded for resentencing, finding that the district court had failed to appreciate its continuing ability to enhance Watson's sentence based on factual findings other than those made by the jury. <u>United States v. Watson</u>, 483 F.3d 828, 835 (D.C. Cir. 2007). The court of appeals noted that "[t]he record suggests that the district court intended to sentence Watson close to the upper limits of its authority." <u>Id</u>. The government nevertheless conceded on appeal that, on remand, this Court would consider the application of the guidelines to the defendant's conduct *de novo*.

The Court should reimpose the 72 month sentence that Judge Jackson originally gave Watson. That sentence the result of a correct calculation of the guidelines as they apply to Watson's offenses and includes enhancements for causing a substantial disruption of public, government, or business functions and for engaging in conduct that evidenced an intent to carry out his threats. <u>See</u> U.S.S.G. § 2A6.1. The original sentence further accounts, under § 3C1.1, for

---

[1] <u>See</u> Exhibit 1 to this memorandum, excerpts from the 6/23/04 sentencing transcript ("Tr."), at 37.

Watson's false and ludicrous testimony at trial that his use of phrases such as "bomb," "blow up," "rigged to go," and "see smoke" had an innocent purpose and was not meant to convey to the police and public that he possessed explosives.

The government's proposed sentence is also reasonable and fully accounts for all of the sentencing factors set forth in 18 U.S.C. § 3553(a). In particular, such a sentence would reflect the seriousness of Watson's crimes, would promote respect for the law, and would have a significant deterrent effect on others who might consider threatening acts of terror as a means of achieving redress for their grievances. Moreover, a lesser sentence – especially the 16 month sentence that Judge Jackson imposed after <u>Blakely</u> – would lead to unwarranted disparities with the punishments that defendants convicted of similar conduct have received, especially those convicted in this district. Indeed, as the government demonstrates below, of all of the defendants in recent years who have been convicted of making hoax threats in this district, it is Watson – the one who created the greatest disturbance and caused the greatest economic loss – who so far has received the lightest sentence.

### Facts Underlying Watson's Crimes

At approximately 12:30 p.m. on March 17, 2003, Royster Norwood, a longtime Park Service employee, was cleaning the walkway around the pond at Constitution Gardens on the National Mall.[2]  <u>See</u> Exhibit 2 to this memorandum, excerpts from the 9/22/03 A.M. Tr., at 41-43. While working, Mr. Norwood noticed a large tractor coming over a small hill at the western

---

[2]  Constitution Gardens is a portion of the National Mall that abuts Constitution Avenue between 18th and 21st Streets. Within the Gardens is a kidney shaped pond, in the middle of which is an island called Signer's Island. Signer's Island has its name because it commemorates the fifty-seven signers of the Declaration of Independence.

end of the Gardens.  Id. at 43-44.  Although the tractor at first did not cause Mr. Royster much concern, he soon noticed it drive at a high rate of speed into the pond.  Id. at 44-45.  He also noticed a seed carrier that the tractor had towed along with it into the pond.  Id. at 45.  After approximately twenty minutes, Watson, who was driving the tractor, unhitched the seed carrier and turned the machine toward Mr. Royster.  Id. at 46-47.  Watson then began driving the tractor "real fast around the perimeter of the pool, making a tidal wave . . . ."  Id. at 47.  According to Mr. Royster, the wave was "three-feet, three-and-a-half-feet . . . [and] [k]nocked debris and fish out of the pond. . . . ."  Id.  At that point, Mr. Royster went to call the Park Police.  Id. at 48.

Park Police Officer Jerre Psak was one of the law enforcement members to respond to Mr. Royster's call about the incident taking place at Constitution Gardens.  Id at 55.  Officer Psak was an eight year veteran of Park Police, and she was both a K-9 officer and a trained crisis negotiator.  Id. at 52-54.  Upon arriving at Constitution Gardens, she drove to the south end of the pond.  Id. at 55-56.  Officer Psak saw in the pond a large green tractor, a jeep with a dirt bike on its back, and a trailer with a big rectangular yellow box.  Id. at 56-57.  She also saw Watson. Id. at 57-58.

Officer Psak motioned for Watson to come to where she was, but he declined to do so, using the PA system on the tractor to communicate with her.  Id. at 58-59.  She asked him for his cell phone number, and he provided it to her.  Id. at 59.  Officer Psak called the number and introduced herself to Watson.  Id. at 59-60.  She learned that his name was Dwight Watson and that he was a tobacco farmer from Whitakers, North Carolina.  Id. at 60.  Watson then made the first of many threats that he would utter over the next two days.  According to Officer Psak:

He said he wasn't here to hurt anyone, but he wanted SWAT to be kept out of the area

-4-

because he was willing to die for his cause.  He said, "That box is loaded with organophosphates and if anybody tries to mount an assault, I will blow it up."[3]

Id.  Watson informed Officer Psak that his cause was the plight of tobacco farmers in North Carolina and the liberation of America.  Id. at 61.  When Officer Psak attempted to learn from Watson the quantity of organophosphates in the box, he responded, "Darling, I'm not going to tell you that."[4]  Id. at 62.  After Officer Psak relayed Watson's threat to her superiors, they instructed her to move away from the pond.  Id. at 63.

Officer Psak assumed the role of the primary negotiator.  Id. at 63-65.  She had more telephone conversations with Watson that afternoon until about 2:00 p.m.[5]  Id. at 65.  For the next several hours, she was unable to make contact with him.  Id. at 66.

At approximately 7:30 p.m., Officer Psak and another negotiator returned to the edge of the pond behind a cordon of SWAT team members bearing ballistic shields.  Id. at 66-67.  Officer Psak used a bullhorn to request Watson to answer his cell phone.  Id. at 68.  He complied.  Id.

During the ensuing conversation, Watson advised Officer Psak:

I didn't tell you this before, but I am going to tell you now.  This whole thing is rigged to go.  The tractor is also.

---

[3]  According to Officer Psak, the box to which Watson was referring was the large yellow box in the pond.  Exhibit 2, Tr. at 60.  See also Exhibit 3 to this memorandum, a copy of Government Exhibit 112 from the trial, which is a photograph of the yellow box.

[4]  Organophosphates are pesticides, and the police ultimately determined that they were not themselves explosive.  However, as described below, the explosive expert did not discount the possibility that Watson had explosive devices that could disperse the organophosphates.

[5]  Among the things that Officer Psak learned from Watson was that he had served in the 82nd Airborne Division.  See Exhibit 2, Tr. at 65.

Id. at 69.  Watson further advised Officer Psak that, "All I have to do is tap three times."  Id.

Officer Psak, who, like Watson, had a military background, understood his statement about

tapping three times to be a reference to a type of mine called a claymore, which a soldier can

detonate remotely by striking a device three times.  Id. at 70.  According to Officer Psak, Watson

also "reiterated that he was willing to die for his cause."  Id.

 During this conversation, Watson made some additional and new threatening statements.

He told Officer Psak that he had left some "presents" around the area, in particular on Columbia

Island, at the Navy Marine Memorial, and near the sign outside the Phillip Morris on Interstate

95 near Richmond.  Id. at 69.  He and Officer Psak then had the following exchange:

> I said, "What presents?  Can you tell me what they are?"  And he said he wasn't going to
> tell me.  I said, "Are these presents going to hurt anyone?"  And he said no.  I said, "Are
> they going to blow up?"  And he said, "Well, only if they get wet?"[6]

Id.  During their evening conversation, Watson also gave some demands to Officer Psak, the

satisfaction of which he claimed could lead him to leave the pond: an appearance with Matt

Lauer and Katie Couric on the Today Show, a conversation with Jesse Ventura, and the presence

of the 82nd Airborne Division on the Mall.  Id at 71-72.  Officer Psak ended her conversation with

Watson around 10:00 p.m., and another negotiator, Park Police Sergeant Kathleen Harasek,

relieved her around 3:30 a.m. on March 18, 2003.  Id. at 72-73.

 Sergeant Harasek reinitiated contact with Watson sometime around 4:30 a.m.  See

Exhibit 4 to this memorandum, excerpts from the 9/22/03 P.M. Tr., at 31.  In one of their early

conversations, Watson reinforced to Sergeant Harasek that his siege on the Mall could have a

---

 [6]  As the government's explosives expert later testified, there is a chemical compound
known as white phosphorous that will readily explode when it comes in contact with water.  See
Exhibit 15 to this memorandum, excerpts from the 9/23/03 P.M. Tr., at 40-41.

tragic conclusion:

| | |
|---|---|
| **Sgt. Harasek:** | Well, I mean, what's the chance of getting you to come out there to talk to people?  I mean, we could - - |
| **Mr. Watson:** | Nah, I ain't going to do that.  Y'all know better than that.  Look, this is a one-way trip for me.  So it ain't – you know, I appreciate you trying on that, but, you know, it's – you know, I know which way I'm going when this thing's over with, because I know who I'm dealing with. |
| **Sgt. Harasek:** | What do you mean it's a one-way trip for you? |
| **Mr. Watson:** | Well, I mean, I ain't going to let y'all put me in jail.  You already put me on my knees.  The attorney generals put me on my knees.  Damn if I'm going to let them send me to jail.  I'm going to fight this. |

* * *

| | |
|---|---|
| **Sgt. Harasek:** | It's not a given that you're going to go to jail. |
| **Mr. Watson:** | Oh, yeah.  I know I ain't, because I ain't going to surrender.  I'm 82nd Airborne, military police.  We don't surrender, period.  I don't surrender to nobody.  I can tell you that right now.  I mean, I could tell – I told Jerre, I said, I said, "Look, get the damn SWAT team to go ahead and blow my head off and, hell, y'all be running with me."  Just hope everything stays together while I'm out there on this damn tractor, though. |

<u>See</u> Exhibit 5 to this memorandum, Tr. of intercepted call 22 at 1-2.[7]

Sergeant Harasek soon broached with Watson a means by which he could leave the

tractor and come safely to shore.  <u>See</u> Exhibit 4 at 49-50.

---

    [7]  By the time Sergeant Harasek replaced Officer Psak as the primary negotiator, the FBI had a wiretap up on Watson's cell phone and all subsequent calls with Watson were intercepted. The government intends to play portions of the calls quoted above at the sentencing hearing so that the Court can discern for itself how Watson's tone of voice added to the threatening nature of his communications.  The recorded calls also belie Watson's trial testimony that he intended his words to have innocent meanings.

| | |
|---|---|
| **Sgt. Harasek:** | And when you came up on the shore, they would just talk you through the rest, no putting down on the ground, you know. Obviously, you know what they're looking for. They're looking for weapons or anything that might be a threat to them. |
| **Mr. Watson:** | Yeah. Well, I got them. They better be looking, because I got them. |
| **Sgt. Harasek:** | You do. What do you have? |
| **Mr. Watson:** | The bible. God's word. |
| **Sgt. Harasek:** | Excellent. Good job. I was hoping you'd say that. |
| **Mr. Watson:** | Sure. |
| **Sgt. Harasek:** | So nothing else, do you? |
| **Mr. Watson:** | Well, I done told you what I got when I came here yesterday. |

See Exhibit 6 to this memorandum, Tr. of call 24 at 2-3. Of course, on the previous day, Watson had said that he had explosives with him. See Exhibit 4, Tr. at 50.

Later in the morning on March 18, Watson began moving the tractor around the pond, causing the members of law enforcement to be concerned that he might take some action. Id. at 51. Sergeant Harasek called Watson to find out what he was doing. Id. By that time, Sergeant Harasek understood that organophosphates were not themselves explosives. She therefore tried to get more information from Watson about what else he had brought with him into the pond that might be dangerous. Id. The following exchange ensued:

| | |
|---|---|
| **Sgt. Harasek:** | But the real sticking part of these issues are [sic] that, you know, early on, you talked about explosives. So you know we're going to be cautious. |
| **Mr. Watson:** | Talked about what? |
| **Sgt. Harasek:** | Explosives. |

-8-

| Mr. Watson: | I said it's organophosphates, yeah. You know, they are – you better make sure you handle them right. Unm. . . . |
|---|---|
| Sgt. Harasek: | Oh, no, I know that. That's what you currently have? Because I'll tell you what, you can clear up a lot of information right now if that's all you have, because there's – you know, the information I got, and, hey, you know what time I came on, I came on at three this morning, and the information that was passed on to me was that you might have had some other kind of explosive devices, something that would, you know, that certainly would leave its mark on the areas that you've been looking at all morning and marveling at, you know, the World War II Memorial and the Washington Memorial and the Vietnam Veterans' Memorial. |
| Mr. Watson: | Well, you're exactly right. It'll leave its mark on it, because I got some organophosphate bombs in that box on this damn tractor and if y'all don't back away from Washington, D.C., in 82 hours and get 82nd Airborne Division up here and the damn farmers up here, we are going to seek the smoke, god damnit. |

See Exhibit 7 to this memorandum, Tr. of call 32 at 3-4.

Sergeant Harasek made other attempts to discern Watson's intentions and his capabilities.

Watson advised her:

| Mr. Watson: | Yeah. Well, you tell them guys on the SWAT team go check my DD-214.[8] I am an expert and if they fire at my ass, I'm going to fire my weapon. I'm going to guaran-damn-tee you I'm going to get every damn one of them . . . . |
|---|---|

See Exhibit 8 to this memorandum, Tr. of call 25 at 3.

Other members of law enforcement also had the opportunity to listen to and observe Watson during his stand-off. FBI Special Agent John Guandolo, an assault team leader for the FBI SWAT squad that was assisting the Park Police on the Mall, was frequently in sight of Watson. See Exhibit 9 to this memorandum, excerpts from 9/23/0 A.M. Tr., at 28-32. He heard

---

[8] A DD-214 is a summary of a person's military record and includes descriptions of any specialized training a member of the armed forces received.

Watson say that "he was ready to go at any time" and make references to going to the "Promised

Land." Id. at 42.  He, too, heard Watson say first that he had bombs on the trailer and then later

that the tractor was explosive as well.  Id. at 43.  Special Agent Guandolo also saw Watson

engage in conduct that reinforced the view that Watson was serious about carrying out his threats

to detonate bombs:

> I observed him wearing something that appeared to be what I thought clearly was a gas
> mask.  For a long period of time and I mean probably well over a day during the incident
> he had his hand up in the kind of upper part of the tractor when he was sitting in the
> driver's seat so we could not see his hand; but if he ever took is hand down, he would
> first put the other one up and then bring the hand down which certainly from my
> perspective led me to believe that he had some kind of detonation device.

> * * *

> There appeared to be something on the dash, and there were a couple things that were in
> the dash of the tractor.

> One appeared to be kind of cylindrical in nature with what appeared to be duct tape
> wrapped around it so we didn't know if it was some kind of improvised explosive device.
> But that certainly with everything we were looking at that would make sense and that's
> what it appeared to be.  There was something that appeared to be a [hand grenade] also up
> in the dash board and that was probably – it wasn't on the first day, maybe the second or
> the final day, I observed that.

Id. at 42-43.[9]

Special Agent Guandolo also witnessed Watson destroy a portion of Signer's Island.

Shortly after midnight on March 19, 2003, Watson drove the tractor to the island.  Id. at 34-36.

According to Special Agent Guandolo, Watson then both repeatedly smashed the shovel at the

---

[9] After Watson surrendered, the agents who searched the tractor and the box on the trailer
did not find a gas mask.  However, Watson did have some protective devices in the tractor that
would resemble a mask if placed over one's face.  See Exhibit 10 to this memorandum, a copy of
Government Exhibit 111 from the trial, which is a photograph of items that were seized from the
tractor.  Agents also found an inert hand grenade in the tractor.  Id.

front of the tractor into the island and dragged the shovel along the shore of the island.  Id. at 36.

The light of day revealed that the damage to the island and to a portion of the retaining wall

around it was extensive.  See Exhibit 11 to this memorandum, copies of Government Exhibits

116-120 from the trial, which are photographs of the damage that Watson caused.

Watson also voiced his threats to those outside the law enforcement community.  In a

phone call with *Washington Post* reporter David Nakamura on March 18, 2003, Watson said the

following:

| Mr. Nakamura: | Right.  Right. You said you don't want to hurt anybody.  Folks we've heard have said that you have indicated that you do have explosives with you, though. |
|---|---|
| Mr. Watson: | I got some organophosphate bombs on this tractor, yeah, I do. |
| Mr. Nakamura: | You do. |
| Mr. Watson: | As long as everybody don't shoot my ass down or come in here and bomb like Waco or burn or shoot me like Ruby Ridge. |
| Mr. Nakamura: | Yeah. |
| Mr. Watson: | They ain't got to worry about nothing. |
| Mr. Nakamura: | Right. |

See Exhibit 12 to this memorandum, Tr. of call 57.

Later that same day, Watson again spoke with Mr. Nakamura and they had the following

exchange:

| Mr. Nakamura: | You know what?  You know what I was wondering?  There's like dozens, maybe up to a 100 agents of different, you know, FBI, ATF, Park Police, who are around that area.  Why do you think they haven't come in after you?  Have you thought about that? |
|---|---|
| Mr. Watson: | Because I got some organophosphate bombs on this tractor. |

| **Mr. Nakamura:** | You've got some what?  I'm sorry. |
|---|---|
| **Mr. Watson:** | If they come in here after me, they're going to [inaudible] these bombs and we're going to have a pit 73 right here in Washington, D.C., like we had at [inaudible].[10] |
| | I told them when I come here, look, I didn't come up here [inaudible]. |
| **Mr. Nakamura:** | What kind of bombs did you say you had?  I'm sorry. |
| **Mr. Watson:** | Organophosphate bombs. |

See Exhibit 13 to this memorandum, Tr. of call 65.

On the morning of March 19, Watson informed Sergeant Harasek that he would

surrender.  See Exhibit 4, Tr. at 60.  Before doing so, he acknowledged to Sergeant Harasek the

effect that his words had been having on the authorities:

> Well, I'm just trying to let you know what's going on so that people will know, okay?  I
> don't want them to wig out and think we're going to blow the damn world up, even
> though they probably think that.  But, I mean, I'm getting ready at 12:00 to come out of
> here and I'm done.

See Exhibit 14 to this memorandum, Tr. of call 161 at 3.  Shortly before noon on March 19,

Watson did surrender.  See Exhibit 4, Tr. at 62.  There were no bombs in either the tractor or the

box on the trailer.  The only organophosphates that Watson had were in six cans of Raid insect

fogger that the agents recovered from the tractor and the yellow box.  Such cans of insecticide are

sometimes colloquially called "bug bombs."

Throughout Watson's standoff, members of law enforcement took his threats quite

seriously and believed that they were in a potentially very precarious position.  As Officer Psak

---

[10]  In his trial testimony, Watson explained that "pit 73" was an ammunition dump in Iraq
during the first Gulf War that accidentally detonated and allegedly injured a large number of U.S.
soldiers.  See Exhibit 18 to this memorandum, excerpts from 9/25/03 Tr. at 43.

testified:

> [W]hen he said there were organophosphates in the box, I had to believe him.  They issue us a gun and a badge.  We don't get a crystal ball with our gear.  So I felt it was serious, and I believed that he had explosives in the box.

See Exhibit 2, Tr. at 62.  With respect to Watson's talk about "seeing smoke" quoted above,

Sergeant Harasek stated that she took him "very seriously" and that:

> Up until that point, I had every reason to believe that he had the intent and the wherewithal to carry out detonating some kind of device and I had absolutely no information that would make me believe that he didn't.

See Exhibit 4, Tr. at 52.  Special Agent Guandolo likewise observed:

> [T]hroughout the duration of the incident there were many times when the term we use in law enforcement is deadly force and we certainly felt it was applicable.  We felt threatened.  We certainly felt that the community was threatened.

See Exhibit 9, Tr. at 41.

The government also called Sergeant Roger Blair from the Metropolitan Police

Department's Explosive Ordnance Disposal Unit, which is also known as the bomb squad.  See

Exhibit 15 to this memorandum, excerpts from 9/23/03 P.M. Tr., at 12-13.  Judge Jackson

recognized Sergeant Blair as an expert in the detection, the disarming, and the handling of

explosives.  Id. at 18.  Sergeant Blair was present at Constitution Gardens during Watson's siege.

Id. at 19.  He made the assessment that the potential blast zone from any explosives that Watson

might have was within a 600 yard radius from the pond.  Id. at 24-25.  Sergeant Blair was

emphatic that law enforcement had to take Watson's threats seriously:

> [W]hen a statement is made to us that an individual may have a bomb, especially in this situation, until the end of the incident, we're going to assume that he has a bomb.  Until myself and members of my team can get on the tractor and get in the box, the yellow box, check out the Jeep for ourselves, we're going to assume until the very end that he has a bomb.

Id. at 25.  Sergeant Blair's assessment of the situation that Watson presented was standard

protocol in his field.  Id.  Even when Sergeant Blair later learned that organophosphates were not

themselves combustible, he continued to treat the situation as if Watson had bombs because it

remained possible that Watson had detonating devices that could explode and spread the

organophosphates.  Id. at 28.

It almost goes without saying that Watson's actions had a significant economic impact on

the region and, to a degree, on the nation while he held the Mall hostage to his threats.  Sergeant

Richard Keevill, station commander for the Virginia State Police in Arlington, testified that the

closure of Constitution Avenue between March 17 and March 19, 2003, turned forty-five minute

commutes from Northern Virginia in the District of Columbia into commutes of two hours to two

and a half hours.  Id. at 75-78.  At the most micro level, Linh Nyugen, a vendor at 20th Street and

Constitution Avenue, testified that the police would not let her set up her stand during the

standoff and that she had lost approximately $100 a day in sales.  Id. at 82-83.

Stephen Clark, the Associate Director of Finance at the Federal Reserve Board and the

official at the Board responsible for continuity of operations in an emergency, testified that the

Board ceased all but essential operations during the forty-eight hour siege.  See Exhibit 16,

excerpts from 9/24/03 A.M. Tr. at 6-11.  He calculated that the approximate monetary loss to the

Board from the closure was between $800,000 and $850,000.  Id. at 11.

Aside from the Board, the Department of the Interior (South Building), the Bureau of

Land Management, and the Organization of American States all either curtailed or ceased

operations while Watson was in the pond.  See Exhibit 17 to this memorandum, Declaration of

Todd C. Reid ("Reid Decl."), at ¶ 4.  During the standoff, there were approximately 100 law

-14-

enforcement officers on the scene for each twelve hour shift, and the rough estimate of law

enforcement costs from the incident was $2 million.  Id.

### Guidelines Calculations for Watson

The Probation Office has determined that the guideline for the threats count (count one) is

§ 2A6.1, which has a base offense level of 12.  See Presentence Report ("PSR") at ¶ 19 and

§ 2A6.1(a)(1).  The Probation Office also has concluded that the following enhancements under

§ 2A6.1 apply: a six-level increase to the base offense level under § 2A6.1(b)(1) because

Watson's crime "involved any conduct evidencing an intent to carry out the threat"; a two-level

increase under § 2A6.1(b)(2) because Watson offense "involved more than two threats"; and a

four-level increase pursuant to § 2A6.2(b)(4)(A) because Watson's actions resulted in

"substantial disruption of public, governmental, or business functions or services."  See PSR at

¶¶ 20-22.  The Probation Office further has determined that Watson warrants a two-level

enhancement under § 3C1.1 to account for his false testimony at trial.  Id. at ¶ 25.  Accordingly,

Watson's adjusted offense level is 26.  Because Watson's criminal history category is I, his

recommended sentencing range at an offense level of 26 is 63-78 months of incarceration.[11]

At his first sentencing, Watson did not object to the enhancement for causing a

substantial disruption of governmental and public functions.  However, he did object to the

enhancements under § 2A6.1(b)(1) (conduct evidencing an intent to carry out the threat),

§ 2A6.1(b)(2) (more than two threats), and § 3C1.1.  As demonstrated below, those objections

---

[11]  The base offense level for the destruction of property charge is 6 pursuant to
§ 2B1.1(a)(2), with a two-level increase to reflect the loss that Watson's mutilation of Signer's
Island inflicted on the Park Service, resulting in an adjusted offense level of 8.  See PSR at ¶¶ 27-
32.  However, because application of § 2A6.1 results in the higher offense level, § 2A6.1
determines Watson's recommended guidelines range.  Id. at ¶¶ 33-39.

lack merit.[12]

**Argument**

I.      **Legal Standards**

In United States v. Booker, 543 U.S. 220 (2005), the Supreme Court ruled that the

Guidelines are no longer mandatory.  However, in the remedy portion of the opinion, the Court

also made it clear that, in determining the appropriate sentence for a defendant, the district court

judge must calculate and consider the applicable guidelines range, refer to the pertinent

Sentencing Commission policy statements, and seek to avoid unwarranted sentencing disparities.

Although the judge must also weigh the factors enunciated in 18 U.S.C. § 3553(a), "it is

important to bear in mind that *Booker/Fanfan* and section 3553(a) do more than render the

Guidelines a body of casual advice to be consulted or overlooked at the whim of a sentencing

judge."  United States v. Crosby, 397 F.3d 103, 113 (2d Cir. 2005).  As one member of this Court

has held, "Booker requires judges to engage in a two-step analysis to determine a reasonable

sentence."  United States v. Doe, 412 F. Supp.2d 87, 90 (D. D.C. 2006) (Bates, J.)

> [A] district court shall first calculate (after making the appropriate findings of fact) the
> range prescribed by the guidelines.  Then, the court shall consider that range as well as
> other relevant factors set forth in the guidelines and those factors set forth in [18 U.S.C.]
> § 3553(a) before imposing sentence.

United States v. Hughes, 401 F.3d 540, 546 (4th Cir. 2005).

After Booker, in resolving issues under the guidelines, the Court continues to use a

preponderance of the evidence standard, and consideration of acquitted or uncharged conduct

---

[12]  At his first sentencing, Watson also sought a downward departure under § 5K.20
(aberrant behavior) and § 5K2.0 (combination of factors).  Because the Court now has more
discretion to vary from the guidelines sentence than in June 2004, the government will address
any reasons Watson proffers for a non-guidelines sentence in its reply memorandum.

remains appropriate.  United States v. Dorcely, 454 F.3d 366, 372 (D.C. Cir.), cert. denied, 127

S. Ct. 691 (2006).  See also In re Fashina, 486 F.3d 1300, 1305 (D.C. Cir. 2007) (preponderance

of the evidence standard).

       When weighing the § 3553(a) factors as part of its calculus of an appropriate sentence,

the Court should consider not only the nature and circumstances of the offense and the history

and characteristics of the defendant, but also the applicable sentencing objectives – that is, that

the sentence (1) reflect the seriousness of the offense; (2) promote respect for the law; (3) provide

just punishment; (4) afford adequate deterrence; (5) protect the public; and (6) effectively

provide the defendant with needed educational or vocational training and medical care.  See 18

U.S.C. § 3553(a)(1) and (2).  In addition, the sentence should reflect "the need to avoid

unwarranted sentence disparities among defendants with similar records who have been found

guilty of similar conduct."  18 U.S.C. § 3553(a)(6).

**II.    Judge Jackson and the Probation Office Correctly Found that Watson Had Engaged in Conduct Evidencing an Intent to Carry out His Threats**[13]

       Section 2A6.1(b)(1) provides that "[i]f the offense involved any conduct evidencing an

intent to carry out such threat, increase by **6** levels."  (Emphasis added)  Here, Watson did several

things that made it appear to all present that he had the ability and the intent to carry out his

threats to detonate bombs.

       The PSR justifies the six-level enhancement on the ground that, during his siege of the

Mall, Mr. Watson made at least six statements that he had bombs in his possession and that he

_____

       [13] Although this Court will resolve the guidelines issues *de novo*, Judge Jackson's
conclusions, coming as they do from the judge who presided over the trial and heard the
evidence, are entitled to some weight.

was prepared to use them. See PSR at ¶ 20. The government acknowledges that, while the D.C. Circuit has never ruled on the issue, a majority of circuits has held that the threats themselves cannot support an enhancement under § 2A6.1(b)(1), but rather that "a defendant [must] engage is some form of overt act . . . ." United States v. Goynes, 175 F.3d 350, 353 (5th Cir. 1999) (cataloguing cases). See also United States v. Newell, 309 F.3d 396 (6th Cir. 2002). But see United States v. Thomas, 155 F.3d 833, 838-40 (7th Cir.), cert. denied, 525 U.S. 1048 (1998).

In this case, the Court does not have to reach the issue of whether the content and number of threats alone can justify the six-level increase under § 2A6.1(b)(1). Watson engaged in several acts that evidenced an intent to carry out the threats.

In most of the threats cases that this Office prosecutes, the threat consists solely of an e-mail, a phone call, or a letter. The communication will have an effect and will create concern on the part of the authorities, but nothing else happens. Here, however, Watson did more than simply write a letter or make a phone call communicating his threats to the authorities. Rather, he traveled to Washington all the way from North Carolina and, when he entered the pond, he brought with him a whole assortment of materials that made it appear as if he had the capability of carrying out his threats. In particular, he towed into the pond the large yellow box that he initially claimed contained his organophosphate bomb. To all outward appearances, that box had the capacity to hold a large explosive device, and the law enforcement agents on the scene reasonably treated Watson's claims about the potentially lethal contents of the box as real.

During the course of the siege, Watson engaged in several acts that further created the impression that he was serious about acting on his threats. As FBI Special Agent John Guandolo testified, for long periods of time, Watson alternated holding one of his hands over his head in a

concealed portion of the tractor cab, leading Special Agent Guandolo and others to conclude that

he was clutching some sort of remote detonating device.  In addition, Special Agent Guandolo

and other officers observed Watson taping a cylindrical device with wires extending from it onto

the windshield of the tractor's cab, something they viewed as another possible remote control

device.  According to Special Agent Guandolo, they also saw him place a hand grenade against

the windshield, and agents found an inert hand grenade in the tractor after Watson surrendered.

These actions reinforced the fears of law enforcement that Watson had the means and intent to

set off his explosives.  Moreover, Watson's enraged assault on the island further demonstrated

his ability and willingness to make good on this threats.  Last, Watson said several times both to

the negotiators and over his loudspeaker that he was prepared to die for his cause.  These

statements bolstered the law enforcement agents' conclusion that he was serious about acting on

his threats.

In sum, there are several specifics acts of conduct on the defendant's part that support the

six-level enhancement under § 2A6.1(b)(1).

### III.    Judge Jackson and the Probation Office Correctly Determined that Watson Had Made More than Two Threats

Section 2A6.1(b)(2) provides for a two-level enhancement "[i]f the offense involved

more than two threats."  The PSR correctly concludes that the facts support such an enhancement

here.  See PSR at ¶ 21.

In United States v. Scott, 441 F.3d 1322 (11th Cir. 2006), the defendant, who was

incarcerated, sent two separate letters six days apart to the federal judge who had sentenced him.

441 F.3d at 1324.  In the first letter, he threatened to kill the judge upon his release.  In the

second letter, Scott threatened to kill other federal judges and to blow up the federal building.  Id.

In the envelope containing the second letter was another envelope.  Id.  That envelope contained

another letter in which Scott threatened to kidnap the sentencing judge's children and to destroy

the judge's car.  Id.  The inner envelope also contained a white powder that the authorities first

feared was anthrax, but which later turned out to be harmless.  Id.  Scott objected to the district

court's decision to enhance his sentence under § 2A6.1(b)(2) on the ground that he had made

more than two threats, arguing that the second letter was part of a single episode and could not be

considered as itself containing multiple threats.  Id. at 1326-27.  The Eleventh Circuit, canvassing

relevant decisions from the other circuits, rejected Scott's interpretation of the guideline and held

that application of the enhancement depends on a simple calculation of the number of threats that

a defendant communicated.  Id. at 1327.

Under this standard, Watson more than warrants the two-level increase to his offense

level.  Here, not only did Watson make repeated threats during his forty-eight hour standoff, but

he also varied the nature of his threats.  He began by saying that the yellow box on the trailer was

loaded with explosives.  He later added that the tractor was rigged with a bomb.  On the evening

of March 17, 2003, Mr. Watson also told Officer Psak that he had left "presents" at three specific

locations – on Columbia Island, at the Navy-Marine Memorial, and alongside the Phillip Morris

sign on Interstate 95 outside Richmond, Virginia.  See Exhibit 2, Tr. at 69.  When Officer Psak

asked whether the "presents" could blow up, Watson responded, "Well, only if they get wet."

Id.[14]  The authorities took this statement seriously enough that they sent Park Police officers to

---

[14]  As described above, Sergeant Blair, the government's explosives expert, testified,
there is a certain chemical compound that will explode if exposed to water.

Columbia Island and the Navy-Marine Memorial and FBI special agents to the Phillip Morris

sign in Richmond.  See Exhibit 17, Reid Decl. at ¶ 2.  They found no explosives at any of those

locations, but Watson's additional threats forced the authorities to devote scarce law enforcement

resources to investigating those statements at a time when such resources were badly needed

elsewhere.  Last, Watson also claimed that he would fire a weapon if the police approached him.

This statement created additional concerns that Watson had firearms with him.

The number and varying nature of Mr. Watson's threats more than satisfy the

requirements for the two-level enhancement under § 2A6.1(b)(2).

### IV.   Judge Jackson and the Probation Office Correctly Concluded that Watson Merited a Two-Level Enhancement under § 3C1.1 to Account for His False Testimony at Trial

Section 3C1.1 provides in relevant part that a two-level enhancement is appropriate "[i]f

(A) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the

administration of justice with respect to the . . . prosecution . . . of the instant offense of

conviction, and (B) the obstructive conduct related to (I) the defendant's offense of conviction

and any relevant conduct." § 3C1.1.  When a defendant's perjury at trial is the basis for the

enhancement, "the sentencing court must determine whether the defendant testified (1) falsely,

(2) as to a material fact, and (3) willfully in order to obstruct justice, not merely inaccurately as

the result of confusion or a faulty memory."  United States v. Thompson, 962 F.2d 1069, 1071

(D.C. Cir. 1992), cert. denied, 507 U.S. 974 (1993).

At trial, Watson testified at length about what he meant when he used certain words and

phrases in his discussions with law enforcement officials and the press.  Among other things, Mr.

Watson claimed that when he said that he had organophosphate bombs, he meant that he had

cans of Raid; that when he said he was going to blow up the tractor and the trailer, he meant that

he would get angry; that when he said the tractor and the trailer were "rigged to go," he meant

that he could put the tractor in gear and drive away if he wanted to; and that when said that he

had organophosphate bombs and that there would be smoke if the authorities did not satisfy

certain of his demands, he meant that, in his frustration, he might push on his accelerator a few

times and cause smoke to rise from the tractor's exhaust pipe.

In particular, the government has identified the following passages from Watson's trial

testimony as containing perjurious statements:[15]

- Watson's testimony at page 19, lines 5-8 and lines 16-19 that the organophosphates on the trailer were merely two cans of Raid and that his claim that he would blow the trailer up was merely another way of saying that he would get angry if SWAT teams tried to remove him;

- Watson's testimony at page 21, line 25, through page 22, line 10, that his statement to Officer Psak that, in addition to the box on the trailer, the tractor itself was "rigged to go" was simply another way of saying that the tractor was in a position to drive off if he put it in gear;

- Watson's testimony on page 22, lines 11-17, and his testimony on page 24 lines 2-4 and 16-20, that his claim to Officer Psak that he had left "presents" in other places in the D.C. area and elsewhere and that the "presents" would "go off" if they "got we" was meant to be nothing more than a statement that there were bottles of tobacco seeds in those places and that the seeds would sprout if they got wet;

- Watson's testimony on page 28, lines 13-20, that, by saying that there were organophosphate bombs on the tractor and trailer, he meant nothing more than a reference to the cans of Raid he had brought with him;

- Watson's explanations for his statements to Sergeant Harasek in Government Exhibit 200-32-T, contained in the underscored portions of pages 31-34, that by

---

[15] Attached as Exhibit 18 to this memorandum are portions of the 9/25/03 morning transcript that contain Watson's testimony on direct examination. The government has underscored the passages that consist of Watson's false statements under oath.

referring to "organophosphate bombs," "leaving a mark," and "seeing smoke," he was merely trying to convey to her that he had some cans of Raid with a toxic substance in them that one needed to handle carefully and that, if he got frustrated with his demands not being fulfilled, he would press on the accelerator of his tractor, thereby causing smoke to come out of the exhaust pipe;

- Watson's testimony on page 39, lines 8-15, that his assertion to Sergeant Harasek that he was going to "fire his weapon" if the SWAT team came after him again meant nothing more than that he would get angry; and

- Watson's statements contained in the underscored portions of pages 41-43 that his assertions to *Washington Post* reporter David Nakamura that he had "organophosphate bombs" were merely meant again to refer to the cans of Raid in the tractor.

Watson's explanations of his statements, as set forth above, were patently absurd. No intelligent person would ever interpret Watson's frequent references to bombs, explosions, and smoke as having the same innocent meanings that Watson claimed he intended to ascribe to those words. Watson is certainly intelligent and, during his testimony, he showed himself to be well-spoken. His fanciful interpretations of his threatening words were plainly lies. By its quick verdict, the jury demonstrated that it rejected those lies.

In his original objections to the PSR, Watson suggested that his false testimony was immaterial because he was merely describing what he was thinking and what he meant. However, those subjects were relevant to one of the central issues in this prosecution – the defendant's intent. One of the elements on which the Court instructed the jury was that the government had to prove that Watson "intended that [his] words be taken as a threat." See Exhibit 19 to this memorandum, an excerpt from the 9/26/03 Tr., which, at page 25, gives the portion of the Court's charge to the jury on the threats count. Watson's falsehoods were thus highly material. They also were at the heart of a deliberate attempt by Watson to fool the jury

into acquitting him.  Section 3C1.1's two-level enhancement plainly applies to Watson.

### V.    Watson Qualifies for an Encouraged Upward Departure under the Terrorism Guideline, § 3A1.4

Application Note 4 to § 3A1.4 states that, in a case that is not a statutorily defined "federal crime of terrorism,"[16] if "the offense was calculated to influence or affect the conduct of government by intimidation or coercion . . . an upward departure would be warranted . . . ." (Emphasis added)  Watson's actions fall within the scope of this encouraged upward departure ground.  The whole purpose of his occupying the pond and threatening to detonate a potentially large explosive device was to force the federal government to change its policies toward tobacco farmers and to force various state governments to alter their positions with respect to the settlement agreement that certain state attorneys general had reached with the tobacco industry. Watson chose acts of intimidation and coercion as his means of effecting change.

The government will not be seeking an upward departure for Watson if the Court adopts the recommendations of the PSR and declines to depart downward or impose a sentence under Booker that is more lenient that the recommended guidelines range.  However, if the Court is contemplating a downward departure or a Booker variance, the fact that Watson satisfies the conditions for an upward departure under the terrorism guideline strongly militates against such a result.  Indeed, the availability of a terrorism departure here underscores the reasonableness of the recommended guideline range and, in particular, the 72 month sentence that Judge Jackson originally imposed.

---

[16]  Section 2332b(g)(5) of Title 18, United States Code, lists a number of crimes of violence as qualifying as federal crimes of terrorism, but the list does not include 18 U.S.C. § 844(e).

-24-

VI.    **An Analysis of the Factors Enunciated in 18 U.S.C. § 3553(a) Demonstrates that Judge Jackson's Original Sentence Is Appropriate**

A.    **The Nature and Circumstances of the Offense**

Watson's crimes created huge disruptions to the Washington, D.C., metropolitan area.  In fact, it is difficult to identify similar offenses in recent times that have had the same type of impact on the community.  Aside from disrupting the normal functioning of the government and the economy here, Watson also created a real danger to himself and others while he was on the Mall.  As Special Agent Guandolo testified, there were instances when those on the scene concluded that deadly force was justified.  Fortunately, law enforcement held its fire.  However, the use of deadly force would have endangered Watson and certainly would have created an even more dangerous environment for the SWAT team members and negotiators at the scene.  Watson threatened to commit horrendous acts that, if they had occurred, would have devastated a national treasure.  Moreover, the availability of an encouraged upward departure under the terrorism guideline underscores the gravity of Watson's crime.  All of these factors support a stringent punishment for Watson, in contrast to the lenient treatment that he so far has received.  Indeed, the court of appeals observed that "[t]he record suggests that the district court intended to sentence Watson close to the upper limits of its authority." Watson, 483 F.3d at 835.  The original sentence fully reflected the seriousness of Watson's deeds.

B.    **The History and Characteristics of the Offender**

Watson is well educated.  In the past, he had been a successful tobacco farmer and businessperson.  Significantly, as several mental health experts now have determined, he does not suffer from any mental illness.  Watson's offenses were nothing more than the manifestation

of an immense ego. There is no excuse for his conduct. Although Watson had not had trouble

with the authorities before March 2003, his actions on the Mall substantially outweigh any

mitigation he might otherwise be due. While several people wrote Judge Jackson and expressed

their admiration for Watson, he is not an individual who has devoted significant portions of his

life to charitable acts or involvement in the community. Moreover, he seems to have done little

with his life since being released from jail and is only minimally employed.

### C.    The Need to Promote Respect for the Law, to Provide Just Punishment, to Afford Adequate Deterrence, and to Protect the Public

In light all of the damage that Watson caused, the 16 month sentence that he so far has

received does little to promote respect for the law or provide just punishment or adequate

deterrence. Indeed, as demonstrated below, Watson's sentence pales in comparison with the

sentences for defendants who have committed similar crimes but had nowhere near the impact

that Watson did on the community. Judge Jackson was clear that deterrence was the "principal

purpose" of the sentence that he fashioned for Watson. See Exhibit 1, 6/23/04 Tr. at 23-24. As

Judge Jackson told Watson when imposing sentence on him:

> Mr. Watson, I have concluded that you are a nice guy and that you had a legitimate
> grievance. And the sentence that I am going to impose upon you is intended to deter the
> next nice guy with a legitimate grievance who might be inclined to do what you did.

Id. at 36-37. The 16 month sentence that Judge Jackson mistakenly thought he had to impose

after Blakely eviscerated this deterrence goal.

### D.    The Need to Provide the Defendant with Educational or Vocational Training

As a college graduate, Watson does not need such training. However, the other factors

bearing on the seriousness of the offenses and the need for strong deterrence outweigh this

element in fashioning a just sentence.

      **E.**    **The Need to Avoid Unwanted Sentence Disparities among Defendants with Similar Records who Have Been Found Guilty of Similar Conduct**

Watson's 16 month sentence would be significantly less than the sentences that other defendants who have committed hoax threat offenses have received in this district. Indeed, to sentence Watson to time-served or to give him any other sentence that is substantially less than the sentence that Judge Jackson originally imposed would create the anomalous situation in which the individual (Watson) who created the most disruption and loss through his threats received the lightest punishment. The sentences in the matters described below demonstrate this point.

      (1)    <u>United States v. Juann Tubbs</u>, Cr. No. 03-294 (JR)

On June 9, 2003, Juann Tubbs, while outside Union Station, pulled a pin out of what turned out to be a dummy hand grenade and threatened to detonate it. He pled guilty in August 2003 to violating 18 U.S.C. § 844(e), and, on December 9, 2003, Judge Robertson sentenced him to 24 months of incarceration. Tubbs had a criminal history category of I.

      (2)    <u>United States v. Jason Lewis Foster</u>, Cr. No. 04-269 (PLF)

On December 12, 2003, Foster called 911 several times and claimed to have placed three bombs in the 400 block of Oklahoma Avenue, NE. He made similar calls to 911 on February 20, 2004. On each occasion, the police evacuated homes and bus and Metro routes were temporarily closed. Foster pled guilty to violating 18 U.S.C. § 844(e). On November 4, 2004, Judge Friedman sentenced Foster, who had a criminal history category of III, to 50 months of incarceration.

(3)      United States v. America Yegile Haileselassie, Cr. No. 04-244 (JDB)

On April 25, 2004, Haileselassie made several calls to 911 threatening to blow up Metro

stations and trains.  These calls caused the authorities to shut down the Metro system for a period

of time.  On September 8, 2004, Judge Bates sentenced the defendant, who had a criminal history

category of II, to 33 months of incarceration.

(4)      United States v. Lowell Timmers, Cr. No. 05-73 (EGS)

On June 18, 2005, Timmers drove a van up to the White House and threatened to

detonate it.  He also threatened to kill the President.  Timmers pled guilty in March 2005.  On

July 20, 2005, Judge Sullivan sentenced Timmers, who had no prior record, to 34 months of

incarceration.

(5)      United States v. Kelvin Kamara, Cr. No. 06-271 (RMC)

Between February 12, 2006, and March 16, 2006, while the American journalist Jill

Carroll was being held hostage in Iraq, Kamara attempted to extort $2 from *The Christian

Science Monitor* by claiming that he could secure Carroll's release.  On September 19, 2006,

Kamara pled guilty to an information charging him with having violated 18 U.S.C. § 875(a).  On

December 8, 2006, Judge Collyer sentenced Kamara, who had no prior record, to 33 months of

incarceration.

## <u>Conclusion</u>

For the foregoing reasons, the Court should reimpose the 72 month sentence that Judge Jackson originally gave the defendant.

Respectfully submitted,

JEFFREY A. TAYLOR
United States Attorney


_____/s/_____
Jay I. Bratt
Assistant United States Attorney
Illinois Bar No. 6187361
National Security Section
Room 11-437
555 4th Street, NW
Washington, D.C.  20530
(202) 353-3602
jay.bratt@usdoj.gov

**<u>Certificate of Service</u>**

I, Jay I. Bratt, certify that I served a copy of the foregoing Government's Sentencing

Memorandum by ECF on A. J. Kramer, Esq., counsel for defendant, by ECF on this 3rd day of

December 2007.

_____/s/_____

Jay I. Bratt