**IN THE**
**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CR NO. 03-146 (TFH) |
| | ) |
| DWIGHT WATSON, | ) |
| | ) |
| Defendant. | ) |

_____

## DEFENDANT'S SENTENCING MEMORANDUM

## INTRODUCTION

Defendant, Dwight W. Watson, hereby files this sentencing memorandum, in response to the government's sentencing memorandum. Mr. Watson has completed in full the sentence that was imposed upon him by Judge Jackson, both the incarceration and supervised release portions, a fact the government does not even mention in its sentencing memo. Because he has completed his sentence, this court cannot now reimpose upon him a new sentence. Even if the court were to somehow conclude that it could reimpose a sentence on Mr. Watson, it should simply reimpose the same sentence that Judge Jackson imposed, which Mr. Watson has already served.

## FACTS

A.   **The Trial**

1.   **Introduction**

This case was known as the "Tractor Man" case, in that it arose from defendant's driving of his tractor, towing a Jeep and a trailer, into a pond on the Mall on March 17, 2003. He stayed there for two more days. Defendant had a number of phone conversations with police officers

during the ensuing standoff, and things he said during those conversations formed the basis for the charge in the first count of the indictment.  At one point defendant moved the tractor, causing damage to a retaining wall and the ground, which was the basis for the charge in the second count of the indictment.

On April 8, 2003, Mr. Watson was charged in a two-count indictment.  The indictment charged threatening and conveying false information concerning use of an explosive, in violation of 18 U.S.C. § 844(e); and destruction of government property, in violation of 18 U.S.C. § 1361.  The offenses allegedly occurred on March 17-19, 2003.

A jury trial of the charges began on September 17, 2003, and on September 26, 2003, the jury found Mr. Watson guilty of both counts (9/26: 98).[1]  On June 30, 2004, Judge Jackson sentenced Mr. Watson to sixteen months imprisonment, to be followed by three years of supervised release, and a $200 special assessment (6/30/04: 8-9).  Mr. Watson has completed service of his sentence.

The government appealed the sentence, and defendant cross-appealed his conviction.  The court of appeals affirmed the conviction, but remanded the case for resentencing.  United States v. Watson, 483 F.3d 828 (D.C. Cir. 2007).

### 2.    The Government's Case

About 12:30 p.m. on March 17, 2003, Royster Norwood, a National Park Service ("NPS") employee, was washing the walkway around the Constitution Avenue Gardens pond

---

[1]  Transcripts are referenced by the date and page number.  Where there are different transcripts for morning and afternoon sessions, the designations "AM" and "PM" appear.  The trial took place in September 2003, and the year is omitted from the date in references to the trial transcript.

(9/22/AM: 42). Constitution Gardens is a very large area with a lake and an island, Signers

Island, which commemorates the signers of the Declaration of Independence [2] (9/24/AM: 47).

The only people in the area were Mr. Norwood and a homeless man sitting on a bench about 30

feet away (9/22/AM: 43). Mr. Norwood saw a green tractor with a seed carrier in the rear

coming from the top of the hill to his left (9/22/AM: 43). Because it was green, Mr. Royster

thought it might be an NPS tractor or a contractor's tractor (9/22/AM: 44). The tractor, with the

seed carrier, came down the hill, splashed into the pond and sat there for 15-20 minutes

(9/22/AM: 45). Then the tractor moved toward the island, where the driver disconnected the

seed carrier, got back in the tractor, and then drove real fast around the pond, making a three-foot

tidal wave, and knocking debris and fish out of the pond (9/22/AM: 47). At that point, Mr.

Royster knew something was wrong and went to call the Park Police (9/22/AM: 48). Royster

heard the driver of the tractor saying over a loudspeaker on the tractor that he was going to get

someone's attention (9/22/AM: 52).

Park Police arrived soon thereafter, including Jerrie Psak, who was trained as a crisis

negotiator (9/22/AM: 54). Psak first thought it was a prank because the tractor was doing

"doughnuts" in the pond in Constitution Gardens (9/22/AM: 56). She described the driver of the

tractor, Mr. Watson, as a heavy-set white male in his 50's wearing an old military steel /pot, or

Red Cross helmet, which was a symbol of those who come to bring aid (9/22/AM: 56; 9/22/PM:

17-18). The tractor had a lot of military stickers on it, including one saying "God Bless the

Troops" (9/22/AM: 57). Also in the pond were a trailer, towed by a Jeep, with a dirt bike on it,

---

[2] Mr. Royster testified that the island commemorated the 56 signers of the Declaration of
Independence (9/22/AM: 47). Another NPS officer testified that there were 57 signers
(9/24/AM: 47).

and behind the Jeep was a big rectangular yellow metal box (9/22/AM: 54).

Psak got out of her car and motioned for Mr. Watson to come over (9/22/AM: 58). He said over the loudspeaker that he would not come over, but he gave her the number to his cell phone, which she called (9/22/AM: 59). Mr. Watson, who was agitated, said his name was Dwight and that he was a tobacco farmer from Whitakers, North Carolina (9/22/AM: 60). He said he was not there to hurt anyone but he wanted a SWAT team kept away because he was willing to die for his cause (9/22/AM: 60).

Mr. Watson also said that the "box is loaded with organophosphates and if anybody tries to mount an assault, I will blow it up" (9/22/AM: 60). When she asked how much organophosphates were in the box, Mr. Watson replied, "Darling, I am not going to tell you that" (9/22/AM: 62). She did not ask what Mr. Watson meant when he said, "I will blow it up," and he did not explain. Mr. Watson was agitated and talking about farmers' issues in North Carolina, and Psak took his statements very seriously (9/22/AM: 62).

Psak thought organophosphates were a fertilizer bomb, but later learned they were pesticides (9/22/PM: 17). The next day, Mr. Watson told her that organophosphates were stored next to baby toys at Wal-Mart, and that he thought sudden infant death was caused by babies putting toys that had been near the organophosphates in their mouths (9/22/PM: 20).

Psak briefed her supervisors and a command post was set up in the area (9/22/AM: 63). Psak had several more conversations with Mr. Watson, and she learned of his military background - - that he was in the 82nd Airborne - - and that he was there for the plight of the

farmers (9/22/AM: 65).  At one point, she told him that he was in the wrong place[3] and that she wanted the situation to end peacefully (9/22/AM: 68).  Mr. Watson, who was very polite, told her that, "This whole thing is rigged to go.  The tractor is also." (9/22/AM: 69).  She did not ask what he meant (9/22/PM: 15).   He stated that he had left "presents" at various locations that would not hurt anyone, but would blow up "only if they get wet" (9/22/AM: 69).

Mr. Watson also said that the tractor was rigged to go, that, "All I have to do is tap three times," and that he was willing to die for his cause (9/22/AM: 70).  Psak, who had been in the military, interpreted this as a reference to how a mine is detonated (9/22/AM: 70).  Mr. Watson later indicated he wanted to go on the Today Show with Matt Lauer and Katie Couric to voice Mr. Watson's concerns, and that he would come out of the tractor for Jesse Ventura, who Mr. Watson trusted, or if the 82nd Airborne parachuted in (9/22/AM: 71-72; 9/22/PM: 16-17).  None of these conversations were recorded - - it was only later that the police recorded the conversations with Mr. Watson (9/22/AM: 71).

About 3:30 a.m., Psak was relieved by Sargent Cathy Harasek (9/22/AM: 73).  Harasek was also a Park Police crisis negotiator, and she also had a number of conversations with Mr.

---

[3]   On March 11, Mr. Watson had applied at NPS for a permit to conduct a demonstration on the Mall (9/24/AM: 31).  He had wanted to hold it near the Vietnam Veterans Memorial, but that was unavailable, so he requested an area near the Washington Monument (9/24/AM: 33).  The permit was approved on March 14, and allowed for an assembly, consistent with the application, on the Washington Monument grounds in support of the Army and other military branches; and to provide information on tobacco farming and hazardous chemicals in department stores - - it allowed for spiritual praise and testimonials and information dissemination (9/24/AM: 37).  The permit was valid from March 16-22, from 8:00 a.m. - 5:00 p.m. (9/24/AM: 37-38).  Mr. Watson was allowed to bring onto the mall a John Deere tractor, a Jeep with a trailer, a public address system, and one sign (9/24/AM: 38).  He had obtained at least five prior similar permits since 1999, so he was well-known (9/24/AM: 41, 45).  Mr. Watson was described as being very personable and polite, and had discussed military personnel issues and the fact that pesticides in Wal-Mart were near items that children would be near (9/24/AM: 42-43).

Watson (9/22/PM: 29).  She arrived at the scene around 2:30 a.m. on March 18 (9/22/PM: 29).

She called Mr. Watson about 4:30 a.m. to let him know of the change in personnel (9/22/PM:

31).  The government introduced a recording of six calls on March 18 and 19 between her and

Mr. Watson (9/22/PM: 15).  These calls took place on March 18 at 6:42 a.m., 7:28 a.m., 7:51

a.m., 10:58 a.m., and on March 19 at 6:36 a.m. and 9:25 a.m. (9/22/PM: 46), and they were

played for the jury.  In the 7:28 a.m. call, she understood that Mr. Watson was referring to

explosives when he said he had told them the day before what he had (9/22/PM: 50).  She called

him at 10:28 a.m. because the tractor had been seen moving and she wanted to know what he was

doing, and she wanted to get more information (9/22/PM: 51).  She told Mr. Watson that he

could clear up some issues if he told her exactly what he had - - he answered and followed up

with what she believed was a significant threat (9/22/PM: 51).  She believed that Mr. Watson had

the intent and wherewithal to carry out his threat and she took very seriously his remark about

seeing smoke (9/22/PM: 52).  Mr. Watson said he would not hurt anyone as long as he was not

provoked (9/23/AM: 9).

Mr. Watson had explained to Harasek that he came to D.C. because he was worried about

the dangers of organophosphates and young children being poisoned (9/23/AM: 5).  He told her

that organophosphates were set next to toys in stores and that babies got sick when they put the

toys in their mouths, that cigarettes had organophosphates on them which were making people

sick, and that soldiers exposed to organophosphates were sick and dying and their children had

birth defects (9/23/AM: 7).

Mr. Watson said he had an organophosphate bomb, but he did not mention a detonating

device (9/23/AM: 19).  She asked repeatedly about explosives, and Mr. Watson said to check his

-5-

military record form, which showed no training in explosives (9/23/AM: 21).  He told her it was

a one-way trip and he was not going to surrender (9/22/PM: 54).  He brought up his military

training a number of times, and said his military papers would show he was an expert with

weapons and would fire back if fired upon (9/22/PM: 56).

In one of the last calls she had with Mr. Watson, he told her exactly what he had in the

tractor - - he said he had Raid bug bombs (9/23/AM: 23-24).  In the early morning hours of

March 19, tear gas was fired at the tractor, but still Mr. Watson did not leave the pond (9/22/PM:

60). She called him at 6:36 a.m. and he said he would surrender at noon, which he did (9/22/PM:

62).

John Guandolo, an FBI SWAT team assistant leader, was on the scene for much of the

two days.  He testified that at one point there were noises from the tractor and it moved toward

the island (9/23/AM: 35).  Mr. Watson drove the tractor onto the island and moved the bucket up

and down, smashing it on the island (9/23/AM: 36).  A video of the tractor moving was played,

but Guandolo testified that it was difficult to see (9/23/AM: 36).

Guandolo talked to Mr. Watson, and told him that Guandolo was a Marine and Airborne

qualified (9/22/AM: 38).  Mr. Watson did not really respond, but began blowing an air horn on

the tractor for a long time (9/22/AM: 39).  He used the loudspeaker on the tractor a lot, making

comments about the 82nd Airborne, Waco, Ruby Ridge, and that he was ready to go to the

Promised Land (9/23/AM: 42).

Mr. Watson, who was wearing a helmet and what appeared to be a gas mask, kept a hand

in the upper part of the tractor where it could not be seen, which made Guandolo think Mr.

Watson had some kind of detonating device (9/23/AM: 42-43).   There also appeared to be a

-6-

duct-taped cylinder and a hand grenade on the dashboard (9/23/AM: 43).   Mr. Watson made

comments, such as if he was attacked there would be smoke, that led Guandolo to believe there

were explosives in the tractor (9/23/AM: 45).

When Mr. Watson surrendered just before noon on March 19, he pulled the tractor to the

edge of the pond, and followed instructions to walk backwards with his hands up and then got on

his knees and was arrested (9/23/AM: 45).  A videotape of the arrest was too bright to be played

(9/23/AM: 45).  Mr. Watson was cooperative (9/23/AM: 45).

Roger Blair, chief of the Metropolitan Police Department bomb squad, was also called to

the scene.  His assessment of the worst case scenario - - if the tractor, trailer, and Jeep were all

filled with the most powerful explosives - - was that buildings on Constitution Avenue would

lose glass, cars on the street would be devastated, and there would be tremendous damage to

surrounding land (9/23/PM: 22-23).  He recommended evacuation in a circle of 600 yards

(9/23/PM: 25).

At some point, Blair was told Mr. Watson was saying he had an organophosphate bomb

(9/23/PM: 26).  Blair consulted a book and learned that organophosphates were not themselves

combustible, but could be toxic or fatal if inhaled or absorbed through the skin, that contact with

gas may cause burns, and that run-off may cause pollution (9/23/PM: 27).  The vapors may

spread along the ground and containers may explode when heated (9/23/PM: 28).  Organo-

phosphates are not explosives (9/23/PM: 43).

After Mr. Watson surrendered, Blair examined all the equipment - - tractor, trailer, box,

and Jeep - - for explosives, but there were none (9/23/PM: 32).  In the yellow box were: a hand-

held radio, a fire extinguisher, gym bags, a rake, an ax, books and tapes, and a red cardboard box

with three Raid pesticide cans (9/23/PM: 34).  The cans were not explosive devices (9/23/PM: 52).  In the tractor was a dummy hand grenade that looked like a hollowed-out pineapple (9/23/PM: 39).

In total, six cans of Raid were recovered, a three-pack in the trailer, and three loose cans in the tractor (9/23/PM: 59).  Raid cans are commonly known as "bug bombs" (9/23/PM: 61).

The government presented several witnesses who testified about the effects caused by the event.  A Virginia state police officer testified that because Constitution Avenue was shut down, traffic on Interstate 66 in Virginia was worse than usual (9/23/PM: 77).   A vendor who earned about $100 a day, testified that the police would not let her set up her stand (9/23/PM: 82-83).  The Federal Reserve, which occupies a building that is on Constitution Avenue, evacuated that side of the building on March 17th, and closed the offices on March 18th and 19th, because of the traffic and problems the employees would have had getting to work (9/24/AM: 8-10).  The Park Police decided to close parts of Constitution Avenue, 17th Street, and other numbered streets near the scene (9/24/AM: 17).

The total cost of repairs, including labor and materials, for damages caused by the tractor to the ground and a retaining wall was $5,386.20.

### 3.    **The Defense Case**

The defense presented two character witnesses, and Mr. Watson testified.  The two character witnesses, Lorraine Doughty and David Cox, testified about Mr. Watson's character for peacefulness and truthfulness.  Ms. Davis had known Mr. Watson since he was born, and Mr.

Cox had gone to school with Mr. Watson and had been his closest friend for many years.[4]

Mr. Watson testified that, except for college and the Army, he lived in Whitakers, North Carolina, a town of 1,500-2,000 people, his entire life (9/25/AM: 5). He grew up on a tobacco farm and he was a tobacco farmer as well as a general crop - - peanuts, soybeans, wheat, cucumbers, corn - - farmer (9/25/AM: 5). He was in the Army for 21 months, 3 days, and a few hours (9/25/AM: 6). In 1980 he and his brothers started Gold Rock Seed Farms on about 1,200 acres (9/25/AM: 6).

Mr. Watson had been concerned about organophosphate pesticides for years and had talked to many people about it, including government officials and his Congressman (9/25/AM: 9-11). Organophosphates are in tobacco insecticides, as well as bug spray and nerve gas, and were reported as causing birth defects in children of soldiers returning from Desert Storm (9/25/AM: 11). Mr. Watson had planned on bringing his dog with him to D.C., but just before he left, the dog ate two dead rats, who may have been poisoned, and got sick (9/25/AM: 13).

It took Mr. Watson about ten hours to drive the tractor, with the Jeep and trailer in tow, to D.C. (9/25/AM:13). He wanted to bring attention to organophosphates, and went into the pond trying not to scare or hurt anyone, or make anyone mad, although he knew the police would come (9/25/AM: 15-16). He unhooked the trailer from the Jeep and waited (9/25/AM: 16). He soon gave Psak his cell phone number (9/25/AM: 18).

Mr. Watson told Psak he had organophosphates in the trailer, referring to the cans of Raid

---

[4] The two character witnesses testified on the afternoon of September 24, 2003. Both parties tried in vain to obtain a transcript of their testimony. The court reporters listed on the docket sheets and notes all say they were not there, so Mr. Watson has been unable to determine who the court reporter was. Reference to the testimony of Ms. Doughty and Mr. Cox is made at the end of the morning session on September 24 (9/24/AM: 64), and in the closing arguments.

(9/25/AM: 18-19).  He said that if a SWAT team came to kill him he would blow it up, which meant he would get angry (9/25/AM: 19).

Mr. Watson kept trying to tell them he was not there to hurt anyone (9/25/AM: 20). When he told Psak the tractor was rigged to go, that meant if he put it in gear it would start moving (9/25/AM: 22).   His reference to "presents" referred to tobacco seeds he had left in a couple of places to show people about high nicotine in tobacco (9/25/AM: 22).  Saying that they would not go off unless they got wet was a reference to the fact that if tobacco seeds get wet they start to grow (9/25/AM: 24).  In the tractor were four bottles with tobacco seeds that would make 3,000,000 packs of cigarettes each (9/25/AM: 23).

Mr. Watson did not remember talking about banging or tapping three times and his references to organophosphate bombs were to the cans of Raid (9/25/AM: 28).  Both Psak and Harasek were nice and professional, but he was surprised when Harasek mentioned explosives, because Mr. Watson had never mentioned them (9/25/AM: 29).  Mr. Watson's response to Harasek that he had organophosphates and that they had to be handled right meant they are very dangerous (9/25/AM: 32).

Mr. Watson's statement about leaving a mark was a reference to the veterans of Desert Storm, who had burns from organophosphates (9/25/AM: 33).  His statement that they would see smoke meant he would give the throttle to the tractor and smoke would come out of it (9/25/AM: 33).  Mr. Watson said if D.C. was not evacuated and the 82nd Airborne did not come and the farmers did not show up, they would see the smoke (9/23/PM: 28).  This referred to a puff of black smoke that would come from the tractor, which was idling the whole time (9/23/PM: 27-28).

Mr. Watson was never asked to explain what an organophosphate bomb was (9/23/PM: 31).  Organophosphates are toxic but won't explode (9/23/PM: 25).  In a call with a reporter from the Washington Post, Mr. Watson said he had an organophosphate bomb, which was the technical term for a can of Raid (9/25/AM: 43).

The entire time, Mr. Watson wore a chain around his neck with "WWJD" on it, which stands for "What Would Jesus Do" (9/25/AM: 36).  He wore the helmet with the red crosses on it to show he had no weapons, was there to help, not hurt, people, and so the officers would not shoot him (9/25/AM: 38).

Mr. Watson's mention of his service record was to show the government was not doing enough for service members (9/25/AM: 40).

Mr. Watson knew what he did was wrong, but he was trying to bring attention to the poisons and their effect on children (9/25/AM: 45).  He went to the pond in front of Signers Island because the Constitution says people have the right to assemble (9/23/AM: 46).  After his cousin and Harasek told Mr. Watson to quit, he decided to give up (9/23/AM: 44).

Mr. Watson went into the pond for three reasons: children being exposed to organophosphates; the tobacco situation and settlement; and standing up for veterans (9/23/PM: 34).

### 4.    **The Original Presentence Process**

Prior to sentencing, Mr. Watson filed a sentencing memorandum challenging several calculations in the presentence report.  The first objection related to a recommended six-level upward adjustment under U.S.S.G. § 2A6.1(b)(1) because allegedly the "offense involved any conduct evidencing an intent to carry out such a threat."  Initially, Mr. Watson noted that he had

been charged in the first count of the indictment with both making a threat to destroy property by means of an explosive and with conveying knowingly false information concerning an attempt to destroy or damage property.  Mr. Watson had requested that Judge Jackson use a special verdict form for the jury to indicate in which manner he had violated the statute, but Judge Jackson refused to do so.  Thus, if as was more likely, the jury had convicted Mr. Watson only of conveying false information, then the 6-level enhancement made no sense.  Mr. Watson also argued that even if the jury had convicted him of the prong of the statute concerning making a threat, his conduct did not evidence an intent to carry out a threat.

Second, Mr. Watson objected to a recommended 2-point enhancement under § 2A6.1(b)(2), for the offense involving more than two threats.  He repeated his argument about being convicted of only the false statement part of the statute, and contended that his conversations were all part of the same course of conduct, and thus that there were not multiple threats.

Third, Mr. Watson objected to a recommended enhancement for obstruction of justice pursuant to § 3C1.1 for committing perjury in his testimony at trial.  He pointed out that the jury could have completely believed his testimony and still convicted him.

Mr. Watson also requested two downward departures from the guidelines: for aberrant conduct under § 5K2.20, and for a combination of circumstances under § 5K2.0.

**5.    The Original Sentencing**

_____At the sentencing on June 23, 2004, Judge Jackson indicated his "tentative agreement with the Probation Office calculation of the guideline range, and for the reasons set forth" (6/3/04: 2).  Mr. Watson, while contesting the 6-level enhancement for conduct evidencing an

intent to carry out a threat, repeated that it was not clear under which part of the statute he had been convicted.  In addition, he had not committed an act evidencing the intent to carry out the threat.  Judge Jackson overruled the objection, finding that the act was "driving a tractor onto the Mall . . . and parking that tractor in a pond . . . with a closed trailer attached" (6/3/04: 5).

Judge Jackson simply "overruled" Mr. Watson's objection regarding making more than one threat (6/3/04:6).  With respect to the 2-level obstruction adjustment, Judge Jackson stated, without explaining, that "[t]he jury found, and I am in accord with the jury's finding" (6/3/04: 6).

Judge Jackson stated that Mr. Watson "by and large has been a very respectable citizen" and that Judge Jackson agreed that Mr. Watson had "a legitimate grievance" about the treatment of tobacco farmers (6/3/04: 8, 21).  Judge Jackson described Mr. Watson:

> I think he's essentially a very good guy who did something very foolish that turned out to be criminal, and I have literally hundreds of letters from his admirers in North Carolina who are themselves eminently respectable people who attest to the fact that he is a good guy.  And he is a very sympathetic figure with a legitimate grievance that he's undertook to express and in a horrendous fashion.

(6/3/04: 24-25).

Judge Jackson believed that Mr. Watson would not commit another offense, but that the principal purpose of the sentence in the case was "to deter someone else who might be similarly inclined" (6/23/04: 23).  Judge Jackson told Mr. Watson that he was "a nice guy" and that he had "a legitimate grievance," but that Judge Jackson had "to deter the next nice guy" who might do something similar (6/23/04: 36).  Judge Jackson then sentenced Mr. Watson to concurrent 72-month terms of imprisonment on each count, to be followed by a three-year term of supervised release, and $200 in special assessments  (6/23/04: 37).

The next day, June 24, 2004, the Supreme Court decided <u>Blakely v. Washington</u>, 542

U.S. 296 (2004).  Later that day, Mr. Watson filed a motion under Fed. R. Crim. P. 35(a) to correct the clear error in his sentence, because 14 points in upward adjustments in the mandatory guidelines range were based upon facts found by the court but not the jury.  The government filed an opposition to the motion on June 28, 2004, and on June 29, 2004, Mr. Watson filed a reply.

On June 30, 2004, Judge Jackson held a hearing on the motion.  He found that there was no "distinction between this case and Blakely at all," and that Rule 35(a) was a proper vehicle to correct the sentence (6/30/04: 7).  Judge Jackson concluded that "the 14 points that I added by reasons of findings on my part which were not made by the jury resulted in those 14 points unconstitutionally enhancing the sentence imposed" (6/30/04: 11).

Judge Jackson therefore vacated his 72-month sentence and resentenced Mr. Watson to concurrent terms of 16 months of imprisonment on each count (6/30/04: 8).  Recognizing that, with credit for time served, Mr. Watson would "be a free man within a matter of hours," Judge Jackson refused the government's request to stay his ruling, stating that "[i]t's something that ought to go forward right now and let's get it resolved" (6/30/04: 12, 13).

The government filed that day, June 30, 2004, its notice of appeal and an emergency motion for stay of the district court's decision.  The next day, July 1, 2004, without requesting a response from Mr. Watson, the court of appeals denied the government's emergency motion for a stay finding that the government had "not satisfied the stringent standards required for a stay pending appeal."

**DISCUSSION**

I.    **IT WOULD VIOLATE THE DUE PROCESS AND DOUBLE JEOPARDY
      CLAUSES TO INCREASE MR. WATSON'S SENTENCE**

Because Mr. Watson has fully served his sentence, it would violate the Due Process and

Double Jeopardy clauses of the Constitution to resentence him.  "[O]nce a defendant fully serves

a sentence for a particular crime, the Double Jeopardy Clause's bar on multiple punishments

prevents any attempt to increase thereafter a sentence for that crime."  United States v. Silvers,

90 F.3d 95, 101 (4th Cir. 1996).  In Silvers, the court reversed the district court's "reimposition of

sentence on counts upon which Silvers had fully satisfied his sentence" because to do so

"violated the Double Jeopardy Clause."  Id.  "[I]ncreasing a legal sentence that already has been

fully served would violate the Double Jeopardy Clause."  United States v. Arrellano-Rios, 799

F.2d 520, 523 (9th Cir. 1986).

In United States v. DiFrancesco, 449 U.S. 117, 136-37 (1980), the Court held that, when

there is a statute which allows the government to appeal a sentence, a defendant does not have

"an expectation of his sentence until the appeal is concluded," and that in such a situation the

sentence may be "increased on appeal."  In DiFrancesco, however, the defendant had not

completed service of the sentence under review - - indeed, the court of appeals in DiFrancesco

had held that it was unconstitutional to increase a sentence "after service of the sentence has

begun."  Id. at 138.  Thus, in rejecting this holding, the Court did not address the situation where

a defendant has fully served the sentence.

The court in Arrelano-Rios relied upon this distinction to distinguish DiFrancesco:

> DiFrancesco, however, did not address the application of double jeopardy
> principles to a defendant whose sentence has been fully served.

-15-

. . .

> In <u>DiFrancesco</u>, the Court makes clear that the initial imposition of sentence is not accorded the same inviolable finality as an acquittal, and, therefore, that a defendant, at that time, has no expectation of finality.

799 F.2d at 523.  The court concluded:

> We need not decide at what point, in the service of a defendant's legal sentence, a reasonable expectation of finality arises.  <u>We are certain, however, that the expectation has arisen, and jeopardy has attached, upon its completion.</u>  This conclusion is supported by the fact that we find no cases holding that finality is not accorded to a fully served legal sentence. Accordingly, we reaffirm the rule that increasing a legal sentence after it has been fully served violated the Double Jeopardy Clause.

<u>Id</u>. at 524-25 (citation and footnotes omitted) (emphasis added).

"Completion of a sentence ordinarily creates such a legitimate expectation of finality," so that subsequently increasing the sentence after appeal violates the Double Jeopardy Clause. <u>United States v. Radmall</u>, 340 F.3d 798, 800 (9th Cir. 2003).  As the court in <u>Radmall</u> noted, "[s]everal circuits have held that a defendant has no legitimate expectation of finality until completion of supervised release," because supervised release is part of the sentence.  <u>Id</u>. at 800. The Seventh Circuit has held to the contrary--after noting that <u>DiFrancesco</u> "did not indicate exactly when during the service of a sentence" an expectation of finality arises--that a defendant who has "completed service of his incarceration" has "acquired a legitimate expectation of finality in . . . the length of his sentence, even though a term of supervised release remains to be served." <u>United States v. Daddino</u>, 5 F.3d 262, 265 (7th Cir. 1993).  In the present case this split of authority does not matter, as Mr. Watson has completed both the incarceration portion of his sentence and the entire term of supervised release.

In <u>United States v. Rhodes</u>, 106 F.3d 429 (D.C. Cir. 1997), the court addressed the

-16-

situation where a conviction under 18 U.S.C. § 924 (c) was vacated after the Supreme Court's decision in <u>Bailey v. United States</u>, 516 U.S. 137 (1995). After vacating the § 924(c) conviction, the court in <u>Rhodes</u> had to decide whether the case could be remanded for resentencing under U.S.S.G. § 2D1.1(b)(1), pursuant to which defendant would receive a higher sentence on the remaining counts, albeit lower than the total original sentence. 106 F.3d at 431-32. The court concluded that it could do so under 28 U.S.C. § 2106. <u>Id</u>. at 432. The court noted that "[a]ppellant could cite, and we could find, no case in which a court has refused resentencing, as a substantive due process violation, because of the amount of time that a defendant has served prior to resentencing," but did not address the situation, as in the present case, where a defendant has served the entire sentence.

Subsequently, in <u>United States v. Morris</u>, 116 F.3d 501 (D.C. Cir. 1997), the court held that where a defendant proceeded under 28 U.S.C. § 2255, as opposed to direct appeal, the situation was controlled by <u>Rhodes</u>. The court in <u>Morris</u> concluded that the "complete interdependence and mutual exclusivity" of § 924(c) and § 2D1.1(b), allowed the sentence on the drug counts to be increased. 116 F.3d at 505. The court stated that given the interdependency of the drug and § 924(c) convictions, the defendants, upon filing the § 2255 motion, could not "have entertained any reasonable expectation in the finality of their" drug sentences. <u>Id</u>. This comports with the notion that a "defendant's expectations regarding finality, therefore, can relate only to his entire sentence, not the discrete parts," <u>United States v. Morris</u>, 133 F.3d 1191, 1194 (9th Cir. 1998), or that the "related drug and firearms charges constituted a unified sentencing package." <u>United States v. Alton</u>, 120 F.3d 114, 116 (8th Cir. 1997). Again, in the present case Mr. Watson has served the entire sentence on both counts, so there is no "interdependency" or

"sentencing package" involved.

Mr. Watson is in the unusual position of having served his entire sentence, both the incarceration and supervised release portions. Every court apparently agrees that at that point, there is a legitimate expectation of finality, and the sentence cannot be increased.[5] Mr. Watson has found no case allowing resentencing in such a situation.[6] Therefore, this court cannot resentence him to an increased term of incarceration.

II.    **IF MR. WATSON IS RESENTENCED, THIS COURT SHOULD SENTENCE HIM TO THE SAME TERM HE HAS ALREADY SERVED.**

A.    <u>**Introduction**</u>

Even if this court somehow concludes that it can resentence Mr. Watson, it should impose the same sentence Mr. Watson has already served. Such a sentence would be perfectly consistent with the governing statute, 18 U.S.C. § 3553(a). As the Supreme Court recently explained, in <u>Gall v. United States</u>, 128 S.Ct. 586, 596-97 (2007), this court must first correctly calculate the applicable guidelines, but "may not presume that the Guidelines range is reasonable," but rather must determine whether the factors set forth in § 3553(a) "support the sentence requested by a party." (Footnote omitted). This court "must make an individualized assessment based on the facts presented." <u>Id</u>. at 597. This court is "free to make its own reasonable application of the § 3553(a) factors, and to reject (after due consideration ) the advice

---

[5]  Mr. Watson did not raise this issue on appeal, because at the time of filing his briefs, the oral argument, and the court of appeals decision, he had not yet completed his supervised release term.

[6]  The government's sentencing memorandum identifies no such case because, as discussed above, the government simply ignores the fact that Mr. Watson has fully served his sentence.

of the guidelines." <u>Kimbrough v. United States</u>, 128 S.Ct. 558, 577 (2007) (Scalia, J.,

concurring).  After <u>Gall</u> and <u>Kimbrough</u>, a "sentencing court may not presume that the

Guidelines range is reasonable." <u>United States v. Pauley</u>, 2007 WL 4555520 at *4 (4th Cir. Dec.

28, 2007).

As the Court in <u>United States v. Booker</u>, 543 U.S. 220 (2005), held, judges are required to

"take account of the Guidelines <u>together</u> <u>with</u> other sentencing factors," and to "consider" the

guidelines along with all the other required factors (emphasis added). <u>Id</u>. at 259-60. But there is

no requirement that a sentence be within the guidelines range, and a number of other statutory

factors, which are mandatory, must be followed by the court.  Indeed, the Court in <u>Booker</u> held

that the statute

> <u>requires</u> judges to impose sentences that reflect the seriousness of the
> offense, promote respect for the law, provide just punishment, afford
> adequate deterrence, protect the public, and effectively provide the
> defendant with needed educational or vocational training and medical care.

<u>Id</u>. at 260 (emphasis added).  Thus, courts are now required to impose a sentence "sufficient, but

not greater than necessary, to comply with the purposes set forth in paragraph (2)" of 18 U.S.C. §

3553(a).  These purposes include the necessity

> (A) to reflect the seriousness of the offense, to promote respect for the
> law, and to provide just punishment for the offense;

> (B) to afford adequate deterrence to criminal conduct;

> (c) to protect the public from further crimes of the defendant; and

> (D) to provide the defendant with needed educational or vocational
> training, medical care, or other correctional treatment in the most effective manner.

Subsections (A) through (D) of § 3553(a)(2) thus highlight the primary purposes of

sentencing, including the seriousness of the offense, the need to afford deterrence and protect the

public, and the need for rehabilitative or correctional treatment.  See also § 3551 (defendant

"shall be sentenced in accordance with the provisions of this chapter so as to achieve the

purposes set forth in subparagraphs (A) through (D) of section 3553(a)(2) . . .").  In determining a

sentence consistent with these goals, the court must consider a number of factors, see

§ 3553(a)(1) - (7), including "the nature and circumstances of the offense and the history and

characteristics of the defendant" as well as the sentencing guidelines and policy statements issued

by the Sentencing Commission.  18 U.S.C. § 3553(a)(4) & (5).  A court may consider all

"information concerning the background, character, and conduct of a person convicted of an

offense," 18 U.S.C. § 3661, and is also directed to "recogniz[e] that imprisonment is not an

appropriate means of promoting correction and rehabilitation."  18 U.S.C. § 3582(a).

The D.C. Circuit has specifically stated that § 3553(a) "remains in effect, and sets froth

numerous factors that guide sentencing," and that because the guidelines are now advisory, they

are "one among a number of factors to be weighed by the District Court in sentencing."  United

States v. Price, 409 F.3d 436, 442-43 (D.C. Cir. 2005).  The D.C. Circuit, in United States v.

Ayers, 428 F.3d 312, 314 (D.C. Cir. 2005), adopted the view of the Second Circuit in United

States v. Lake, 419 F.3d 111, 114 (2d Cir. 2005), that "without the mandatory duty to apply the

guidelines, consideration of the other section 3553(a) factors 'acquires renewed significance.'"

(Quoting United States v. Crosby, 369 F.3d 103, 111 (2d Cir. 2005)).

And the Circuit decided in United States v. Gomez, 431 F.3d 818 (D.C. Cir. 2005), that

"[i]f Booker's rendering the Guidelines discretionary means anything, it must give a district

judge greater latitude on these issues than did Koon [v. United States, 518 U.S. 81 (1996)]."

Gomez, 431 F.3d 825. The court further noted that a denial of a departure was "a quite different inquiry" from whether a district court "if subject to the guidelines only a discretionary basis, . . . would be reasonably likely to give a lower sentence." Id. at 826.

Other courts of appeals have recognized that the guidelines are not always consistent with other goals of sentencing and that those goals sometimes conflict with each other. A prime example is United States v. Serrata, 425 F.3d 886, 913-15 (10th Cir. 2005), where the district court had erred in granting departures under the guidelines to three defendants for factors such as family ties and responsibilities, employment record, community support, lack of a criminal record, and civic and public service. The court went on to hold, however, that these same factors were relevant to the district court's consideration, under § 3553(a), of whether a sentence below the advisory guidelines range was appropriate. Id. at 918. "Just because a consideration was improper under the mandatory Guidelines regime does not mean that it is necessarily improper under the advisory Guidelines regime." United States v. Garcia, 497 F.3d 964, 971 (9th Cir. 2007).

Likewise, in United States v. Scott, 405 F.3d 615, 617 (7th Cir. 2005), the court stated that "with the guidelines advisory the judge can take into account mitigating factors that the guidelines ignored." "[A]nything but a loose comparison to pre-Booker departure cases would vitiate the post-Booker discretion that sentencing courts enjoy." United States v. Castro-Juarez, 425 F.3d 430, 436 (7th Cir. 2005). Factors that were discouraged as departures under the guidelines "might afford more weight in a particular case" under the statute. United States v. Lata, 415 F.3d 107, 113 (1st Cir. 2005).

B.    **The Guidelines Calculations**

1. **Introduction**

While Mr. Watson agrees that the applicable guideline is U.S.S.G. § 2A6.1, he contests most of the adjustments requested by the government as inapplicable.  The government fails to recognize, and does not address, the fact that Mr. Watson was charged in Count One of the indictment both with making a threat to destroy property by means of an explosive <u>and</u> with conveying false information, knowing that information to be false, concerning an attempt unlawfully to destroy or damage property.  There is nothing in the record from which this court can determine that the jury found Mr. Watson guilty of "maliciously conveying false information concerning an attempt to destroy property by means of an explosive," or whether it found him guilty of "willfully threatening to use explosives"- - indeed, it appears more likely, if anything, that it found him guilty under the false statements prong of the statute.  The fault for this lies with the government.  Mr. Watson specifically requested a special verdict form detailing which prong of the statute upon which the jury based its verdict.  Judge Jackson refused to submit such a form, and the government never requested one.  Under the circumstances, this court cannot find that Mr. Watson was convicted of willfully making threats as opposed to conveying false information. <u>See</u> <u>Gall</u>, 128 S.Ct. at 602-03.  ("The door therefore remains open for a defendant to demonstrate that his sentence, whether inside or outside the advisory Guidelines range, would not have been upheld but for the existence of a fact found by the sentencing judge and not by the jury") (Scalia, J., concurring.)  Even if this court were to attempt to make such a finding, which it should not, it should at least apply the reasonable doubt standard, as opposed to a preponderance standard.

The testimony at trial -- and the recorded communications themselves -- establish that Mr. Watson, numerous times and in numerous ways, told the Park Police officers and the Washington Post that he had organophosphates and an organophosphate bomb.  That fact is undisputed.  He also spent a great deal of time expressing his views on many, many issues: the plight of Gulf War veterans, opposition to the war, the plight of tobacco farmers, opposition to insecticides, and frustration with people who had maligned the tobacco industry.  While the government has maintained throughout this prosecution that some of Mr. Watson's statements constituted threats to use explosives, it is significant that in the hours and hours of recorded transcript Mr. Watson never used the word explosive.  Nor did he ever use the word bomb without specifying that what he had was an "organophosphate bomb."  Thus, it is far more likely that the jury found that Mr. Watson conveyed false information than that it found that Mr. Watson willfully threatened to use explosives at some point.

With this as background, Mr. Watson objects to the characterization of the "facts" in the presentence report.  In paragraph 10, the Presentence Report indicates that Mr. Watson "in four conversations with a U.S. Park Police officer, clearly threatened to use his explosives, namely, March 18, 2003, at 6:42 a.m., 7:28 a.m.; 7;51 a.m., and 10:58 a.m.  On that same date, "Watson held two conversation with the Washington Post reporter David Nakamura, in which he claimed to have explosives."  PSR ¶ 10.  It is far from "clear" that Mr. Watson "threatened to use his explosives" in any of those conversations.  Putting aside the fact that Mr. Watson had no explosives, beginning with the 6:42 a.m. conversation, according to the transcript introduced by the government at trial, the word "explosives" or "bomb" never crossed Mr. Watson's lips.  Indeed, Mr. Watson never discusses explosives at all.  There is nothing in the transcript of that

conversation except Mr. Watson saying that he is "not going to be put on my knees" and that he does not want to be put in jail.  In the 7:28 a.m. conversation, according to the government's transcripts, Mr. Watson again makes absolutely no mention of explosives or bombs.  Indeed, when Officer Harasek asks him what weapon he has, he replies, "I got the ultimate weapon . . . The bible.  God's word."  There is absolutely no threat to use an explosive.

        Similarly, in the 7:51 a.m. conversation, Mr. Watson never mentions explosives or bombs.  He discusses why he came to Washington, D.C.: "See, that's what inspired me to come up here, because I see there's truth, been talking to the soldiers and they been telling me about how they got gassed over there in Iraq and when they fought in Desert Storm and they're sick and their children are sick, and I said, damn, I said, that's my job, military police.  Stand up and do something about it."  Mr. Watson does say that "if they fire at my ass, I'm going to fire my weapon," but he never says that "weapon" is explosives or a bomb.  Finally, in the 10:58 a.m. conversation, the only person who mentioned explosives is Sgt. Harasek.  In response to Sgt. Harasek's statement that Mr. Watson earlier had talked about explosives, Mr. Watson says, "Talked about what?"  When Sgt. Harasek repeats the word "explosives," Mr. Watson says that he has "organophosphates."  Throughout his conversation with both Sgt. Harasek and Officer Psak, Mr. Watson repeatedly says that he has "organophosphates" and "organophosphate bombs."  Just as his conversation with Sgt. Harasek and Officer Psak, Mr. Watson in his conversation with Mr. Nakamura said that he had "organophosphate bombs."  Whether organophosphates can properly be characterized as explosives is certainly disputable--particularly in light of the testimony of the government's witness that organophosphates are not explosives-- and thus it is far from "clear" that Mr. Watson "threatened to use his explosives."  See PSR ¶ 10.

-24-

Judge Jackson instructed the jury that it could find Mr. Watson guilty if it unanimously found that Mr. Watson made a willful threat to use explosives or if it unanimously found that Mr. Watson's statement was a malicious false statement concerning an attempt to use explosives (9/26: 84-86). The government throughout the case argued that the jury could find Mr. Watson guilty because he said he had explosives and there were no explosives found. See e.g. Bill of Particulars at ¶ 1 ("In light of the fact that, after Mr. Watson's [sic] ended his standoff on the Mall, law enforcement officers found no explosives in the yellow box on the trailer, the government also considers Mr. Watson's statements concerning the presence of explosives in the box and his plans to detonate them under certain circumstances to be false"). During the trial, the Court defined the term "threat" to the jury in a very specific way. For instance, the Court instructed that "mere bluster, idle talk, exaggeration, or jest" does not constitute a threat, and that "the conditional nature of a statement may be a factor bearing on whether the statement is merely an exaggerated expression rather than a threat," (9/23: 85). Moreover, the intent standard under the "threats" prong of the statute is much higher than that for the "false statements" prong. In order to have found Mr. Watson guilty under the "threats" prong of the statute, the jury had to find that he acted "willfully," meaning that he "intended that the words be taken as a threat" (9/23: 83-84). Under the "false statements" prong, the jury had only to find that Mr. Watson "reasonably should have foreseen" that he was conveying false information concerning an attempt to destroy property by means of an explosive" (9/23: 86). Based on these instructions, it is much more likely that the jury found that Mr. Watson maliciously "conveyed false information" concerning an attempt to destroy property by means of an explosive rather than finding that he threatened to use explosives.

-25-

## 2. The Six Point Adjustment Pursuant to Section 2A6.1(b)(1) Does Not Apply

The government first contends that under 2A6.1(b)(1), a six-point enhancement is warranted because the "offense involved any conduct evidencing an intent to carry out such threat (GSM 17)".[7]  However, if Mr. Watson was convicted under the "false statements" prong of the statute, as discussed above, the enhancement under Section 2A6.1(b)(1) makes no sense.  The enhancement applies only if the "offense involved any conduct evidencing an intent to carry out such threat."  If the jury found that Mr. Watson conveyed a false statement by saying that he had explosives on the tractor, it is nonsensical to look for conduct evidencing an intent to carry out a threat.  Thus, the enhancement under Section 2A6.1(b)(1) is not warranted.[8]

Even if the Court finds that Mr. Watson made threats, the threats themselves are not sufficient to warrant an enhancement under Section 2A6.1(b)(1).  See e.g. United States v. Goynes, 175 F.3d 350 , 353-55 (5th Cir. 1999) (holding that there must be some sort of overt act, beyond the threats themselves, to warrant the enhancement under 2A6.1(b)(1).[9]  In Goynes, the defendant wrote letters to people in the legal community threatening to kill the recipients and their families.  One of the letters asserted that the defendant had signed the letter with his own

---

[7]  "GSM" refers to the government's sentencing memorandum.

[8]  The government claims, citing no authority, that "Judge Jackson's conclusions . . . are entitled to some weight" (GSM 17 n.13).  This is incorrect.  The current proceeding is a de novo sentencing, and Judge Jackson's guidelines determinations are of no effect - - indeed, they were vacated by Judge Jackson himself.  In any event, they are not entitled to any weight at all, never mind "some" (unspecified) weight, both because this is a de novo sentencing, and because Judge Jackson made no "findings," but simply stated his decisions in conclusory terms.

[9]  The government apparently does not dispute this (GSM 18).

blood.  Following the defendant's indictment, he continued to write threatening letters even after

he was indicted.  The court held that the six-point adjustment pursuant to Section 2A6.1(b)(1) did

not apply.  The court in Goynes held that some conduct, separate from the threats themselves,

was required before the Section 2A6.1(b)(1) enhancement applied.  The court reasoned: "Holding

that threats alone are enough to support a § 2A6.1(b)(1) enhancement would contradict the plain

language of the Guideline which authorizes an enhancement where the offense involves conduct

evidencing an intent to carry out the threat."  Id. at 355.  Notably, the court found that the

defendant had not taken action evidencing an intent to carry out the threats in the letters despite

the fact that the defendant signed one of the letters in blood.  In this case, as in Goynes, there

simply is not conduct evidencing an intent to carry out any threats.  Accordingly, the six-point

adjustment does not apply.

The government relies primarily upon the fact that Mr. Watson entered the pond with the

large yellow box behind his tractor.  In fact, though, the permit that Mr. Watson obtained from

the Park Service allowed him to bring a tractor, a Jeep, and a trailer onto the Mall (9/24: 38).  As

Mr. Watson testified, it was only at the last minute that he decided to drive into the pond, instead

of  to the area designated in the permit.  The government refers to other actions that Guandolo

said he observed, but there was no evidence that Mr. Watson intended to convey any messages

through these actions, or that he knew his actions were being so interpreted.

The lack of merit in the government's contention is further demonstrated by its

exaggeration that Mr. Watson made an "enraged assault on the island" (GSM 19).  How the

damage to the island evidenced an "ability and willingness to make good on his threats" is left

unexplained.

-27-

For all the above reasons, the court should not include the 6-point upward adjustment of § 2A6.1(b)(1) in the guidelines calculation.

### 3.  The Two Point Adjustment Pursuant to Section 2A6.1(b)(2) Does Not Apply

The government also asserts that a 2-level increase under § 2A6.1(b)(2) is appropriate, as the "offense involved more than two threats" (GSM 19).  Initially, for the same reason as discussed above, this adjustment should not be applied, as Mr. Watson was more likely convicted under the false statement portion of the statute than the threat part of the statute.

The government relies upon United States v. Scott, 441 F.3d 1322 (11th Cir. 2006), in support of its argument.  In Scott, the defendant sent three separate threatening letters, one on one day and the other two six days later, one contained within the other.

In the present case, however, the conversations with the Park Police officers and Mr. Nakamura all took place as a part of the same course of conduct and with the same motivation, and any statements made within the course of these conversations should not be counted separately for purposes of Section 2A1.6(b)(2).  See United States v. Stokes, 347 F.3d 103, 106 n.2 (4th Cir. 2003) (holding that single letter which threatened the lives of several distinct people did not warrant Section 2A6.1(b)(2) enhancement because all of the threatening statements within the letter "were similar in nature and were based on the same grievance").  Because all of Mr. Watson's alleged statements were similar in nature and were based on the same grievance, there were not multiple threats and the two-point enhancement is not warranted.

### 4.  <u>The Two Point Adjustment Pursuant to Section 3C1.1 Does Not Apply</u>

The government contends that another 2 levels should be added to the offense level for

Mr. Watson's alleged perjury, pursuant to § 3C1.1.  In order to find that an enhancement under

Section 3C1.1 applies, the Court must find that "the defendant testified (1) falsely, (2) as to a

material fact, and (3) willfully in order to obstruct justice, not merely inaccurately as the result of

confusion or a faulty memory."  <u>United States v. Thompson</u> 962 F.2d 1069, 1071 (D.C. Cir.

1992).  To apply this enhancement this court must find "more than perjury" - - it must also find

that "the perjury had been committed with the specific intent to obstruct justice."  <u>United States</u>

<u>Canova</u>, 412 F.3d 331, 357 (2nd Cir. 2005).[10]  The enhancement cannot be imposed "simply

because a defendant testifies on his own behalf and the jury disbelieves him" <u>United States v.</u>

<u>Abdul-Azie</u>, 486 F.3d 471, 479 (8th Cir. 2007) (quoting <u>United States v. Flores</u>, 362 F.3d 1030,

1037 (8th Cir. 2004)).

In this case, there was not false testimony.  This is not a case in which Mr. Watson denied

that any of the events at issue took place when he testified.  Instead, he testified only about what

he was thinking and what he meant as he went through the three days, and he also testified

regarding why he came to the District of Columbia.  The jury could well have believed every

word he said and still have found him guilty.  As discussed above, it is not at all clear that the

---

[10]  The government contends that Judge Jackson correctly concluded that Mr. Watson committed perjury at trial (GSM 21).  Judge Jackson did no such thing.  Before Mr. Watson testified, Judge Jackson stated that the jury's verdict is determinative as to whether a defendant committed perjury and that he was inclined in almost all instances to impose the enhancement when a defendant testified and was convicted (9/25: 3).  At sentencing, when addressing the obstruction adjustment, Judge Jackson stated, "The jury found, and I am in accord with the jury's finding" (6/23/04: 6).  Such conclusions are not findings, and are inadequate for imposition of a § 3C1.1 enhancement.

jury concluded that Mr. Watson made threats - - it more likely found that he reasonably should have foreseen that he was conveying false information concerning the use of explosives, a fact the government again ignores.  Indeed, the jury may well have found based on Mr. Watson's testimony that he did not intend to make a threat, and he therefore did not willfully threaten to use explosives, but that he should reasonably have foreseen that he was conveying false information concerning the use of explosives.  Notably, the government, which has the burden of proof at sentencing, never asked for a special verdict so that there could be certainty about what exactly the jury found.

Thus, this case stands in stark contrast to cases in which the jury had to disbelieve the defendant's testimony in order to find him guilty, and the enhancement therefore may apply.  See e.g. Thompson, 962 F.2d at 1071-72.  Even if the jury had to disbelieve Mr. Watson's testimony in order to find him guilty, moreover, it appears that the Court could still find that the evidence is insufficient to warrant the enhancement.  See id. (suggesting that the Court may still deny enhancement even "[w]hen the jury has answered the first question [whether defendant testified falsely] by finding beyond a reasonable doubt that the defendant lied, and could not have been convicted otherwise" because "a reasonable judge' might not necessarily agree with the jury finding).

There was no willful falsity in Mr. Watson's testimony.  He had a slightly different recollection than Officer Psak on some points of the recorded conversations, but as the government itself recognized,"[b]ecause there is no recording of the conversation between the defendant and Officer Psak, the exact words Mr. Watson used are unknown to the government." Bill of Particulars at ¶1.  Thus, to the extent that there are minor variations between Officer

-30-

Psak's testimony and Mr. Watson's testimony, those differences were neither "material," nor is there evidence that they are anything except one side or the other slightly misremembering. Because there was no willful falsity, Section 3C1.1 does not apply.

    **5.**    **The Offense Level Should be Decreased by Two Levels for Acceptance of Responsibility Under § 3E1.1**

Mr. Watson did not request the two-level downward adjustment for acceptance of responsibility under § 3E1.1 at the original sentencing. In light of the events of the intervening years, however, an adjustment under this provision is warranted.[11]

Ordinarily, "the adjustment is not intended to apply to a defendant" who goes to trial. § 3E1.1, comment. (n.2). However, "[c]onviction by trial . . . does not automatically preclude a defendant from consideration for such a reduction." Id. "In rare situations a defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to trial." Id. Among the factors a court can consider in deciding whether an acceptance reduction is warranted is "post-offense rehabilitative efforts." Id. at n.1(g).

"[I]n appropriate circumstances the reduction is also available in cases in which the defendant manifests genuine contrition for his acts but nonetheless contests his factual guilt at trial." United States v. Cantrell, 433 F.3d at 1285 (quoting United States v. McKinney, 15 F.3d 849, 853 (9th Cir. 1994)). "This rule, we explained, would best serve the 'primary goal of the reduction [which] is to reward defendants who are genuinely contrite.'" Id. (quoting McKinney,

---

    [11] "[T]he sentence on remand can and should take account of intervening facts that normally bear on sentencing." United States v. Lata, 415 F.3d at 113 n.3.

15 F.3d at 853).

Mr. Watson's conduct, while serving the term of his supervised release and since then,
shows that he is "genuinely contrite" about his conduct and recognizes the folly of his conduct.
Again, this case is in an unusual posture, Mr. Watson having served his sentence, and is one of
the "rare situations" where it is appropriate to grant this reduction even though Mr. Watson went
to trial.

> **6.**     **Mr. Watson is Entitled to Downward Departures Pursuant to
> Sections 5K2.20 and 5K2.0**

>> **a.  Mr. Watson is Entitled to a Downward Departure Pursuant to
>> Section 5K2.20 Because The Event was Aberrant Conduct**

Section 5K2.20 provides for a departure "in an exceptional case . . . if the defendant
committed a single criminal occurrence or single criminal transaction that (1) was committed
without significant planning; (2) was of limited duration; and (3) represents a marked deviation
by the defendant from an otherwise law-abiding life."  The departure under Section 5K2.20 is
prohibited in cases where: "(1) The offense involved serious bodily injury or death, (2) The
defendant discharged a firearm or otherwise used a firearm or a dangerous weapon, (3) The
instant offense of conviction is a serious drug trafficking offense, (4) The defendant has either of
the following: (A) more than one criminal history point, as determined under Chapter Four
(Criminal History and Criminal Livelihood) before application of section (b) of 4A1.3
(Departures Based on Inadequacy of Criminal History Category); or (B) a prior federal or state
felony conviction, or any other significant prior criminal behavior, regardless of whether the
conviction of significant prior criminal behavior is countable under Chapter Four."  See U.S.S.G.
§ 5K2.20(c).

A departure under Section 5K2.20 is warranted in this case.  None of the prohibitions in subsection (c) are present in this case.  There was no serious bodily injury or death, Mr. Watson did not use any firearm or other weapon, this is not a drug trafficking case, and Mr. Watson has no criminal history.  Moreover, this was a "single criminal occurrence or transaction" - it was the series of conversations in the telephone calls that constituted the offense conduct, and that conduct was a single criminal transaction.

Mr. Watson also meets the three necessary criteria to warrant a Section 5K2.20 departure. First, all evidence indicates that there was no significant planning to this offense.  While there may have been some planning for the trip to Washington D.C. itself, there was no planning for the offense conduct.  At trial, in response to the question, "When did you decide for sure that you were going into the pond," Mr. Watson testified: "When I got here.  I had, you know, figured either go set it where the Park Police had designated to it; but if there was a way to get it into the water that would not hurt anybody or nobody was around as far as being in any kind of danger, you know, just to get into the water and draw attention to it." (9/23: 46).  In fact, none of the things that Mr. Watson did in preparation for his trip to Washington, D.C. were in any connected to the offense itself, which is the threatening of false communications.  Even assuming arguendo that the driving into the pond had some aspect of planning to it, there is no indication that Mr. Watson had made any significant plans to subsequently make threatening communications or to destroy property.  For instance, although Mr. Watson came to Washington D.C. a couple of days prior to March 17, 2003 to obtain a Park Service permit to demonstrate on Park Service property, it does not appear that when he obtained the permit he intended to park in the pond or to have the conversation he had with the Park Service officers.  Moreover, Mr. Watson had previously

-33-

obtained a permit and had come to Washington, D.C. and demonstrated without any incident, and in that instance he had also come up with his tractor.  Accordingly, the offense was committed without significant planning.

Second, the offense was of limited duration.  The entire series of events lasted for approximately 48 hours, and Mr. Watson then surrendered to authorities.  This is not a case where, for instance, a defendant engages in a series of fraudulent transactions over a long period of time.  Instead, this is a case where Mr. Watson came to Washington, D.C. and surrendered himself to authorities all within 48 hours.

Finally, this offense "represents a marked deviation by [Mr. Watson] from an otherwise law-abiding life."  Mr. Watson has absolutely no criminal history.  Both of Mr. Watson's character witnesses testified about Mr. Watson's exemplary character.  David Cox testified that he had known Mr. Watson since they were young men.[12]  Mr. Cox testified that Mr. Watson believes very strongly in his duty to others.  This testament to Mr. Watson's character was truly extraordinary.  And as the attached letters attest, Mr. Watson has taken very seriously his duty to his country and to others.[13]

Mr. Watson grew up on a farm in Whitakers, North Carolina.  His father, George B. Watson, owned Watson Seed Company, Watson Seed Farms, and Gold Rock Farms.  In the state of North Carolina and beyond, George Watson had a reputation as a successful and principled farmer.  Dwight Watson left the family farm to serve in the U.S. Army, 82nd Airborne in Fort

---

[12] There is no transcript available of this testimony.

[13]  The originals of the letters were submitted with Mr. Watson's original sentencing memorandum.

Bragg, North Carolina. After his military service, Mr. Watson returned to his family farm to help his father run the farm. As Mr. Watson testified at trial, it is a 1200 acre farm with tobacco, corn, wheat, and soybeans. Although Mr. Watson's two brothers left the farm, Mr. Watson remained there to help his father, even as circumstances for farmers became more and more difficult. Mr. Watson ultimately took over the operations of the farm and bought it from his parents. Throughout that time, as Lorraine Doughty testified, he was incredibly good to the people who worked on the farm, and he took great pains to ensure that the people who worked there were treated well. Mr. Watson was also an incredibly good farmer, as the attached articles demonstrate. In 1983, he was named the tobacco farmer of the year in North Carolina, and he was known throughout North Carolina as one of its most successful farmers. The conduct in this case truly is aberrant.

In addition to meeting the three criteria enumerated in the guideline, Mr. Watson's case also is "extraordinary." See United States v. Guerrero, 333 F.3d 1078, 1081 (9th Cir. 2003) (holding that district court must find that the case is "extraordinary" before granting a downward departure pursuant to Section 5K2.20). In deciding whether a case is extraordinary, the court may consider the factors in Application Note 3 of the Guideline: "[T]he defendant's (A) mental and emotional conditions; (B) employment record; (c) record of prior good works; (D) motivation for committing the offense; and (E) efforts to mitigate the effects of the offense." See United States v. Castano-Vasquez, 266 F.3d 228, 235 (3rd Cir. 2001). Consideration of those five factors compels a conclusion that Mr. Watson is entitled to this departure. As discussed above, Mr. Watson led an exemplary life until March 17, 2003, primarily because of his passion for quality in the farm's produce and his commitment to the people who worked there, Mr. Watson

became firmly convinced that the pesticides that were being sprayed on the crops, pesticides such as organophosphates, were causing sickness both to consumers and to people who worked on the farms where those pesticides were used. As he testified at trial, he became convinced that many of the children who are born with birth defects have been affected by pesticides and chemical agents.

In addition, Mr. Watson was very upset about the litigation undertaken by the states against the tobacco industry. Based on his knowledge of the history of the tobacco industry and his understanding of the tobacco seed laws, he had always understood that both the state governments and the federal government prohibited tobacco seed manufacturers from selling low-nicotine tobacco seeds and prohibited tobacco farmers from planting low-nicotine tobacco seeds. In other words, he had always understood that it would be illegal under state law to sell low-nicotine tobacco seeds and illegal under federal law to grow those seeds. Given that understanding (which appears to be accurate), it is not surprising that tobacco farmers like Mr. Watson felt that it was unfair for the states -- which had forbidden them from buying low-nicotine tobacco seeds--to sue them for "manipulating" nicotine levels to keep them high.

Mr. Watson came once to Washington, D.C. to demonstrate and to raise awareness. He also spoke to his congressional representative and representative of the Farm Service Agency. When he ultimately felt that nobody would ever listen to or hear his message, he came to Washington, D.C., and that was when he landed in the pool. He felt that it was the only way he could get his message across. Even at the time, though, he told everyone repeatedly that he did not want anyone to be harmed and that he was not there to hurt anyone. He truly meant that. And his motivation, as he testified at trial, really was only to get his message to people.

Mr. Watson's motivation for taking the actions he did here in D.C., his state of mind when he came here to D.C., his prior record of good works, and his entire employment history--all those years on the farm--make this an extraordinary case. Accordingly, Mr. Watson is entitled to a departure pursuant to Section 5K2.20.

### b.  Mr. Watson Is Entitled to a Downward Departure Pursuant to Section 5K2.0 Because of a Combination of Circumstances

Mr. Watson also is entitled to a downward departure pursuant to § 5K2.0 because the conduct was outside the "heartland" or the "set of typical cases embodying the conduct that each guideline describes," and because his conditions of confinement will be more severe than are warranted.  U.S.S.G. Ch.1, Pt.A, 4(b).[14]  As the Supreme Court made clear in United States v. Koon, 518 U.S. 81, 108 (1996), "a federal court's examination of whether a factor can ever be an appropriate basis for departure is limited to determining whether the Commission is proscribed, as a categorical matter, consideration of the factor.  If the answer to the question is no--as it will be most of the time--the sentencing court must determine whether the factor, as occurring in the particular circumstances, takes the case outside the heartland of the applicable Guideline."  A number of factors take this case outside of the heartland.

Mr. Watson is now a fifty-five-year old man with no prior criminal record, and he did not hurt anyone with his actions.  He served his country honorably in the military.  Nonetheless, because of the Bureau of Prisons Guidelines, his offense of conviction is deemed a "crime of violence."  See Bureau of Prisons, Policy Statement 5162.02.  That classification may well result in Mr. Watson's inability to participate in certain programs like the boot camp program, and it

---

[14]  This refers to the guidelines manual in effect when Mr. Watson's conduct took place.

may also result in significantly harsher conditions of confinement than are otherwise warranted. For that reason, Mr. Watson is entitled to a downward departure. Cf. United States v. Smith, 27 F.3d 649 (D.C. Cir. 1994) (holding departure appropriate where defendant's alien status results in harsher conditions of confinement).

In addition, this case is outside of the heartland because of Mr. Watson's motivation in committing the acts that led to his conviction.  As discussed above, Mr. Watson was attempting to get a message through to the American public.  He had tried every way he knew how, and he felt compelled to share the messages that he thought people were dying from exposure to pesticides.  In some ways, he committed the acts in defense of others--he felt that people should know the dangers of pesticides and that people should understand the truth about the tobacco lawsuits.  Because his motivation, although not amounting to a complete defense, is outside of the heartland of those ordinarily charged with threatening communications, Mr. Watson is entitled to a departure.

### c.    No Upward Departure Under § 3A1.4 is Warranted

The government, acknowledging that § 3A1.4 is not applicable to the present case, does not seek an upward departure under its application notes, but claims that the fact that Mr. Watson satisfies the conditions for an upward departure "strongly militates" against the court imposing a sentence other than what the government suggests (GSM 24 & n.16).  This argument by the government is meritless.  The government cites no case for its position or for its claim that application note 4 of the guideline applies to Mr. Watson's conduct.  In fact, Mr. Watson made clear that he was attempting to call the public's attention to the issues about which he was concerned, and that his conduct was not "calculated" at all, much less calculated to influence or

affect government conduct by coercion or intimidation or to retaliate against government conduct.

### C.    The § 3553(a) Factors

As discussed above, sentencing now takes place in accord with § 3553(a), and the guidelines are only one factor to be considered.  That statute "contains an overarching provision instructing district courts to "'impose a sentence sufficient, but not greater than necessary' to accomplish the goals of sentencing."  Kimbrough, 128 S.Ct. at 570. While the guidelines are to be given "respectful consideration," the court is permitted "to tailor the sentence in light of other statutory concerns as well."  Id. (quoting United States v. Booker, 543 U.S. 220, 245-46 (2005)).  "A district court's decision to vary from the advisory Guidelines may attract greatest respect when the sentencing judge finds a particular case "outside the 'heartland' to which the Commission intends individual Guidelines to apply.'"  Kimbrough, 128 S.Ct. at 574-75 (quoting Rita v. United States, 127 S.Ct. 2456, 2465 (2007)).  Mr. Watson incorporates all the factors discussed above regarding why departures are appropriate as to why a sentence different than the advisory guidelines range is warranted.

In this context, also, the government completely ignores the fact that Mr. Watson has completed his sentence.  The government cites no case, and Mr. Watson can find none - - probably because, as discussed above, it would violate the Double Jeopardy Clause to do so - - where a defendant has been sent back to jail where the sentence, including the supervised release term, has been fully served.  This makes Mr. Watson's case not only extraordinary, but

apparently the only one of its kind.[15]  The government's failure to even acknowledge this fact, much less discuss it, undermines the foundation and integrity of the government's entire memorandum.  Indeed, the court of appeals specifically stated that this court must "give due consideration to the fact that Watson likely has completed serving his sixteen months of imprisonment," 483 F.3d at 837,[16] which the government never even mentions in its memorandum.

There is obviously no need "to protect the public from further crimes of the defendant," § 3553(a)(2)(c).  Judge Jackson believed Mr. Watson would not commit another crime and that is borne out by his successful completion of supervised release.  Especially at Mr. Watson's age, there is a "diminished risk of recurrence" of the behavior, and thus a lower sentence is warranted under § 3553(a).  United States v. LATA, 415 F.3d at 113.

Nor is there any need to deter Mr. Watson from further criminal conduct, § 3553(a)(2)(B).  He has obviously been deterred by the long period of time he spent in custody at D.C. Jail.  The "sentence certainly constitue[d] a deterrent to" Mr. Watson.  United States v. Cherry, 487 F.3d, 366, 370 (6th Cir. 2007).  Judge Jackson's primary purpose at sentencing

_____

[15]  In United States v. Martin, 363 F.3d 25, 34 (1st Cir. 2004), the defendant had served 15 months of a three-year term of probation when the court of appeals issued its opinion from the government's appeal of the sentence.  The court of appeals vacated the sentence, remanding for imposition of a term of imprisonment.  The court of appeals recognized that this "presents an unfortunate circumstance," and "determined that Martin must receive credit for time served on probation against any sentence of imprisonment." Id. at 38, 41.  The decision in Martin was, of course, made when the guidelines were mandatory.  In United States v. Yeaman, 248 F.3d 223, 231-33 (3d Cir. 2001), the defendants were still on supervision (supervised release and probation) at the time of the appeal.

[16]  Mr. Watson had completed his term of imprisonment long before even the briefs were filed in the appeal.  It is, therefore, unknown why the court of appeals used the word "likely."

seemed to be the deterrence of others.  Nothing in that regard would be accomplished by re-incarcerating Mr. Watson.  The trial and the original sentence imposed by Judge Jackson accomplished this purpose.  Re-incarcerating Mr. Watson almost four years later would add nothing to the deterrent effect of the original sentence.  It would promote disrespect for the law, not respect, §3553(a)(2)(A), to put Mr. Watson back in prison.

The term of incarceration he served obviously meant more to Mr. Watson, who had never previously been in prison, "than to a defendant who previously had been imprisoned."  United States v. Baker, 445 F.3d 987, 992 (7th Cir. 2006).  See also United States v. Collington, 462 F.3d 805, 808 (6th Cir. 2006) (sentence below guidelines range warranted where defendant had "never been in custody for any substantial period of time").  Mr. Watson's "lack of criminal history" and his "history of employment and higher education" also warrant a reduced sentence under § 3553(a).  Baker, 445 F.3d at 992.

The government's reference to five other cases in support of its sentencing disparity argument, § 3553(a)(6), is unavailing.  As an initial matter, none of these offenses involved conduct remotely similar to that of Mr. Watson--Mr. Watson acted to call public attention to issues seriously affecting the lives and health of large numbers of people.  The cases cited by the government all involved people acting for personal reasons--the exact opposite of Mr. Watson.  Moreover,  four of the five received less than half of the sentence the government now is attempting to impose upon Mr. Watson.  Two of the five were above criminal history category I.  One of the crimes, attempting to extort money regarding a hostage being held in Iraq, is not even close to comparable to the present case, thus demonstrating the lengths to which the government is willing to go.  Indeed, it appears that Mr. Watson's 16-month sentences is not disproportional

at all to the sentences meted out to these other defendants.

Furthermore, the government has access to the details of those cases and the presentence reports. Mr. Watson does not. If the court intends to rely upon these cases, Mr. Watson requests that his sentencing be continued and that the government be ordered to provide him with the discovery packages in those cases and the presentence reports, so that he is able to properly address the supposed comparable cases.

The government engages in hyperbole by its claim that "Watson's offenses were nothing more than the manifestation of an immense ego" (GSM 25-26). Not only is there nothing cited in support of this statement, and putting aside the fact it is contradicted by the letters sent in support of Mr. Watson, it is also directly contrary to Judge Jackson's repeated descriptions of Mr. Watson as a "very good guy." Mr. Watson's "work ethic" and his "very good and positive adjustment" to "supervised release for three years" also justify a lower sentence. United States v. Jones, 460 F.3d 191, 194 (2d Cir. 2006).

"A term of incarceration would ruin his life and no good purpose would be served thereby." United States v. Decora, 177 F.3d 676, 678 (8th Cir. 1999). Mr. Watson has had "an excellent record of compliance with the terms of supervision . . . for post-trial release." United States v. Niemoeller, 2005 WL 1799456, at *5 (S.D. Ind. 2005). Having served his supervised release term for such a long period, his conduct shows that he is "ready, willing, and able to comply with the law." Id. Mr. Watson would not get any "help he needs in prison." Cherry, 487 F.3d at 370. Sending Mr. Watson back to prison "would serve no end, but ritualistic punishment with a high potential for destruction," United States v. Rodriquez, 724 F.Supp. 1118, 1119 (S.D. N.Y. 1989), and "would be the cause most likely to undo his rehabilitation." Id. It would be

-42-

pointless to do so, at a cost of $25,000 per year, and the government's attempt to re-incarcerate Mr. Watson is nothing other than petty and vindictive.

As Jeffrey Taylor, the United States Attorney for this district, referring to an employee of his office, has put it in words directly applicable to Mr. Watson, "Sure, he's made some mistakes in judgment . . . For gosh sakes, everybody deserves a second chance." *Washington Post*, Tuesday, May 8, 2007 at p. A4.  It is completely hypocritical for the government to take the opposite position in Mr. Watson's case, especially after he has completed the sentence imposed by Judge Jackson.

## **CONCLUSION**

For all the above reasons, Mr. Watson contends that this court cannot resentence him because, having served the entire sentence, it would violate his due process and double jeopardy rights to do so.  Alternatively, Mr. Watson respectfully requests that the court re-impose the sentence he has already served.

Mr. Watson is a fifty-year-old man who has spent his entire life trying to do the right thing.  He recognizes that he should not have landed in the pond.  And he also recognizes that he should have chosen a different method of communicating his message.  As discussed above, he came here with the best of intentions to spread his positive messages, but things quickly spun out of control for him.  His motive alone takes this case out of the "heartland."  As the attached letters and the testimony of Lorraine Doughty and David Cox demonstrate, however, the Dwight Watson in the pond March 17-19, 2003, is not representative of the Dwight Watson of the previous fifty years, or the one of today.  The Dwight Watson of  fifty years touched many people, stood for helping and protecting people, and worked hard every minute of every day.  The

Dwight Watson of today is a changed man, truly remorseful and sorry for what he did, having learned the hard way, and having served the sentence for his actions.

Because of his time in the pond, he has paid an incredible price.  He was in the D.C. Jail for over fifteen months, and he feels that he has let down all those most closely associated with the farm.  To re-incarcerate him at this time would serve no purpose.

Respectfully submitted,


_____
"/s/"
A.J. KRAMER
Federal Public Defender
625 Indiana Ave., NW
Suite 550
Washington, DC   20004